International & Great Northern Railroad Company v. J. H. Johnson and Wife.

Decided March 14, 1900.

1. **Railway—Negligence—Location of Switch—Charge Construed.**

An instruction authorizing recovery for the death of an employe if caused by a wreck "due to the location of said switch and switch stand at said point [on a curve and grade] and the construction of the road and roadbed at said point and to the unsafe condition of same" if found to be negligently constructed and maintained, did not authorize such recovery upon a mere finding of negligence in locating the switch and switch stand.

2. **Contributory Negligence—Brakeman Riding on Engine.**

See evidence held to support a finding against defendant upon the issue of contributory negligence on the part of a brakeman killed in a wreck while riding on the engine.

3. **Verdict.**

A verdict finding that the son of plaintiffs "came to his death * .* * through the negligence of defendant," and assessing damages in favor of the parents respectively, is sufficient to support a judgment for plaintiffs, without other general finding in their favor.

4. **Railway—Negligence—Sufficiency of Evidence.**

See evidence held sufficient to support a verdict for plaintiffs in a suit for death of a brakeman by derailment of a train, alleged to be caused by negligent construction and maintenance of a switch, and defended as caused by the switch having been tampered with for the purpose of causing a wreck.

5. **Negligence—Location of Switch.**

By Key, J.—Though negligence can not be asserted by reason of the location of a switch upon a grade and curve, that circumstance may be considered as imposing the duty of greater care for the safety of the track at that point than would otherwise have been required.

6. **Negligence—Burden of Proof—Wreck Caused by Open Switch.**

By Key, J.—While the burden of proving negligence causing the death of an employe was upon plaintiffs, proof that it was due to a derailment caused by an open switch justified a finding of such negligence, unless defendant showed that it had exercised proper care to keep the switch and track in safe condition.

7. **Failure to Introduce Evidence.**

By Key, J.—The general custom of other railroads in reference to timely inspection being admissible, failure of defendant to introduce such evidence may be considered in determining whether it has discharged its duty.

8. **Negligence—Injury to Servant—Degree of Care.**

By Key, J.—A railway owes the same degree of care to an employe engaged in service upon its trains as to a passenger.

9. **Negligence—Inspection of Track.**

By Key, J., Fisher, C. J., concurring.—The fact that displacement of a switch by outside parties caused the wreck and injury would not relieve defendant where there had been no inspection thereof for six hours preceding the accident, such default in inspection being sufficient to support a finding of negligence in that particular.

10. **Negligence—Inspection—Train Wreckers.**

By Key, J.—A railway may be held under duty to inspect its track to guard against criminal attempts to wreck its trains.

Appeal from Travis, Twenty-sixth District. Tried below before Hon. R. E. Brooks.

*S. R. Fisher,* for appellant.

*John Dowell* and *Hogg & Robertson,* for appellees.

KEY, Associate Justice.—This is a statutory action by appellees to recover from appellant damages for the death of their son, George F. Johnson; and from a verdict and judgment in their favor the defendant has appealed.

We omit the testimony disclosing the plaintiffs' relationship to the deceased and bearing on the amount of damages they sustained; but deem it proper to set out in full all the evidence bearing on the question of negligence, which is as follows:

Chas. P. Scrivener, for the plaintiffs: "I live in Austin, and have lived there about twenty years. I am a graduate of King's College, London, a school of engineering. I have knowledge of topographical surveys, railway surveying, and construction of railroads, including main tracks, side tracks, etc. After the accident complained of and the removal of the switch and switch track, I visited the scene of the accident for the purpose of locating the switch and switch track. I think I went there in February, 1898, in company with Captain Walter Sneed, who is now in the United States army, and who is also a civil engineer by profession. We went there for the same purpose. The switch was not there at that time, but the main track was. We could see from the evidences on the ground where the switch and switch track had been. In connection with Captain Sneed, I made a survey of the main track and switch at that place and executed a plat of it. This is the plat I made. It is correct. It shows the switch and the main track. The switch and main track are in a little stone cut. The track runs on a down grade from the switch to the bridge, the railroad bridge that crosses the Colorado River. There is another little bridge about a third of the way down the switch on the main line. The grade at that point is about 1.25. By that I mean one foot and three inches, or a foot and a quarter in one hundred feet. I do not know the grade south of the switch. This switch I should judge to be about a mile, or a mile and a half back from the bridge south of the Colorado River. We drove out to the switch. We located the switch by the tie marks that still remained in the soil, but I knew of my own knowledge that the switch had been there. I was familiar with it when it existed. [Here the witness explained to the jury his sketch, showing the position of the main track, the spur or the switch track, the switch, and the different objects on the sketch.] The switch at its north end did not connect with the main track. The switch, switch stand, and switch track were all gone at the time the sketch was made. The length of the switch track was 860 feet. The distance from the connection between the main track and switch track at the switch to the small trestle or culvert shown on the map is 630 feet. That

trestle or culvert was put there to drain a little ditch. There is a curve near the point where the switch was located, but I have not the degree of the curve. I expect I put it down in my book, but haven't it with me. The city of Austin would be north of the switch and south of the switch would be toward San Antonio. I presume that the distance between the main track and switch track, measuring from center to center, would be about sixteen to eighteen feet. The location of a switch on a railroad always increases the percentage of risk of accident. I did not consider that switch as located there on the ground to be located as a permanent switch at all, as part of the road,—as a permanent working switch is what I mean. It was evidently located there from the surroundings, as merely a working switch for the purpose of taking out rock for ballast or something of that kind. No engineer would locate a permanent switch on a curve and a down grade like that."

[In answer to the following questions, "Well, in your opinion, now, as an expert constructor of railroads, would the location of this switch at this point leave the road reasonably safe for the operation of trains over it or not?" the witness answered, "It would certainly make it dangerous."]

Cross-examination: "If the switch in question was constructed in the manner in which railroad switches are properly constructed, it would certainly be reasonably safe for the passage of trains; what I mean is, it is a switch that would need extra watching. If that switch were placed as reasonably well constructed switches are placed, trains could certainly be safely operated over it. I do not mean to say that it was dangerous per se, absolutely, to operate trains over that switch, unless there was something the matter with the switch. I think perhaps my sketch is not exactly correct as to the location of the switch and switch stand. I think there is a difference between my sketch and the sketch of the railroad engineer. I think I have located on my sketch the switch and switch stand a few feet nearer the curve than the location indicated on the map made by the railroad engineer. I think perhaps the difference would be about fifteen feet. The railroad map is undoubtedly correct, as is also my map. The difference in the maps is that I make the switch track a little longer. I locate the switch stand further south."

C. S. Morgan, for the plaintiffs: "I reside in Austin, and have resided here about twenty-three years. I was born and raised here. I was in the employ of the defendant company as a switchman and night yardmaster for about seven years, leaving the service on December 11, 1896. I served as a brakeman on that road about three months. I never knew a brakeman to be prevented from riding on an engine at any time. So far as I know, there is never any objection offered to a brakeman's riding on an engine. I was acquainted with Fred Johnson before he went to railroading. I have not been to the scene of the wreck since the accident. I was familiar with the switch where

the wreck occurred, and knew the condition of the track and of the switch. I have been familiar with it about seven years. During all of that time I was familiar with this switch, and passed over it every day when I worked and knew the condition of the railroad and switch at that point. The switch was held in position like any other switch would be; it was held with a rod, and they use a spike there when they were not using the switch; spiked the rail. The spike was driven in the tie side of the rail. It was a split rail between the two main rails, and when it was turned to the opposite rail it turned a train into the main track. When we used the switch track we pulled the spike out. The hole became so enlarged we did not have to pull the spike out; we could lift it out with the fingers. The rod was supposed to hold the rail in position, but the spike was driven in to keep the rail from being moved. If a man should come along and move the loose spike out with his fingers, he could take a bar and prize the rail out far enough and chock it so that a flangeable wheel could go in it without disturbing the lock. There was a spring on the rod. The spike had nothing to do with holding the rails to the track, except that it held the split rail in case anyone wanted to throw it with a bar. If you were to go there and pull the spike out and put a prize in there, you could prize the rails apart, and it would just leave an open switch. Unless it was blocked clear over to the other track, it would derail the train. It would throw it off into the side track. That could be done without breaking the lock. The (spike) was put there to keep it from being thrown by anybody outside of the railroad men, unless they broke the lock. The main track is in good condition. The switch track is on the side of the hill, and it was turned in down to that bottom there and ran into the solid rock bluff. The track was not on a line. It was on a curve. The surface of the track was on a curve. I could not say the track at this point was level, as it was on a hill. The ties of the switch track at the little bridge were imbedded in the ground. The switch was used for getting rock out of the quarry."

Cross-examination: "I was discharged from the service of the company; I suppose they discharged me because they wanted to. I worked about three months as a brakeman. I am not thoroughly familiar with the duties of a brakeman. The rear brakeman on a freight train stays in the caboose. The position of the head brakeman is on the head end of the train. They do not have swing brakemen on the defendant's road. The position of a swing brakeman is in the middle of the train. If the train is moving and the swing brakeman wants to go back and rest, or anything of that sort, his position would be in the caboose. I do not know what was Fred Johnson's position on the train at the time of the accident. I do not know that he was the swing brakeman. If he was the swing brakeman, I suppose his position was in the middle of the train. If he was not there, I suppose his position would be in the caboose or anywhere in the train. I do not know that the rear

brakeman and the swing brakeman have no business on the engine. This cut shown me [meaning the cut offered in evidence] is a correct representation of a switch like the one at the scene of the wreck. The spring and the connecting rod are used for the purpose of holding the rails to the track or 'for throwing the switch from one rail to the other. When they were not using the switch, as an extra precaution they put a spike down so as to hold the switch rail up against the main rail; the purpose of that was to prevent anybody from tampering with the switch. If the switch were in good order, the connecting rod, unless tampered with, would be sufficient to hold the rails in place. I had not been at the place where the accident occurred for some time prior to the wreck, and therefore did not know the condition of the switch on the day of the accident, nor do I know whether additional spikes had been put down or not."

J. H. Toalson, for the plaintiffs: "I reside in South Austin, and have lived in this community about four years. I was familiar with the switch where the accident complained of happened. I have been there while they were getting rock out of the quarry at that place. I have been familiar with the railroad track at that point since I have been living over there. I was along the track every few days at the time Mr. Johnson was killed. I was at the scene of the wreck within an hour after the accident. At that time there were five or six cars off the track. I could not tell how many cars remained on the track; there may have been ten or fifteen. Three or four cars were turned over. I saw the body of the deceased, Fred Johnson, lying under one of the cars. The engine was forty or fifty yards north of the trestle. The engine had not turned over, but just plowed in the ground; the tender had turned on its side. I could see where the wheels had left the track and run along in the middle. Some of the derailed cars fell on one side and some on the other. Along here at the switch and near where the rails split on down to where the engine was, the track was torn up. It was pretty badly torn up. The rails were twisted and displaced and the ties were knocked around. I was familiar with the switch track at that point. Before the accident, that track was rough. There was not much bed for the switch; of course there had to be some bed for it to lie on; the rails were spiked on what were there, but up and down it was rough. The ties in the switch track were on top of the ground. There was no ballasting on the switch track. I looked at the switch after the wreck. The chain on the lock was broken, but the lock to the best of my recollection was not broken. The office of the chain was to keep the lock from being taken off. In case the lock had been unlocked and broken loose, the chain would have held it there. The chain performed no service in the way of holding the rails together. At the bottom of this business that held the lock, the piece that ran straight up and down was disconnected. There were not many persons there when I got there. I do not know how many had been there before I got there. I saw the engineer, fireman and conductor.

I don't believe I noticed any brakemen. The track hands and section hands came afterwards. I was there about half an hour or an hour and then went away."

Cross-examination: "I arrived at the place where the wreck occurred about half an hour afterwards. I was at my house and heard the danger signal and the sound of the wreck and went over there. It is about a quarter of a mile from my house to the place where the accident happened. Mr. Best and I walked over there together as soon as we heard the noise. We found the track torn up and rails displaced about twenty feet north of the switch. I do not think any of the cars struck the switch stand; the stand did not show it and none of the cars were against it. I saw some rocks packed in between the point of the switch and the main rail. The rocks held the rails apart; the rails could not be closed with the rocks packed in there. The switch target was set for the main track when I saw it. The whistle post must have been about thirty or forty feet from the switch stand. The whistle post was bent over and I saw some tracks around there and saw some mud on the post. It looked like an effort had been made to pull it up. It was a damp, drizzly day. I remember going to the office of Mr. Fisher, the attorney for the defendant, last March, and making a statement of what I know of this case. This statement handed me is the statement I made at that time. At that time, I stated, 'on the day of the wreck at the rock quarry switch, in which Geo. F. Johnson was killed, I was at the scene of the wreck almost immediately after it happened. I was at my home near the railroad track and about a quarter of a mile distant when I heard the danger signal.' By the word 'immediately' I mean the time it would take me to go over there. When I got to the wreck the switch was adjusted so as to derail a train. The engine and cars left the track something like three or four feet after they struck the point of the switch. The rocks held the point of the switch away from the rail, and it was wide open when I got there. If a train approached it in that way it would be derailed. There was a spring there to drive the rail back, but it was disconnected."

Redirect examination: "It was half an hour, or not more than an hour, after the wreck before I got there. When I reached the wreck I met Mr. Roy's people coming away. The rocks that I saw between the point of the switch and the main rail were just such rocks as were in the quarry. They had been mashed up I suppose. They were a kind of adobe rock that they get out of the bank. I suppose some of the rocks I saw there were about the size of my fist and some were smaller. Some of them were stuck up probably flush with the top of the rail and some were not so high. There was no sign of the flanges of the wheels passing over the rocks. I just noticed the rocks between the rails. If a car had passed over where the rocks were, I suppose the flanges would have dropped in where the rocks were; to the best of my knowledge, that would have been the necessary consequence. I saw some of the rocks crushed. At the point where the rails came together, I did not

see any rocks driven in the ground like a heavy object had passed over them, though farther on I did. I do not suppose those soft rocks would resist much force. I had been there probably half an hour before Sheriff White and Justice Johnson came."

J. A. Warren, for the plaintiffs: "I live in Burnet, Texas. I came into Austin from Elgin, Bastrop County, on the day of the wreck at the rock quarry switch. At the time of the accident Mr. Best and I were about three or four hundred yards away, right near Mr. Roy's place. We were looking for a pony when we heard the wreck, and we turned and went to where the wreck occurred. We heard the engine whistle when we were about three or four hundred yards away. The whistle and the rumbling of the wreck occurred simultaneously. We stopped and listened, and Mr. Best remarked 'that must be a wreck,' and we went over to it. It could not have been more than fifteen or twenty minutes after the wreck until we arrived on the scene. The track was torn up. I did not see any rocks jammed in between the switch and the main track. As far as looking around carefully is concerned, we took in the situation, but did not see anything of the kind. I could not say whether the lock on the switch was broken or not." Q. "Are you certain that there were no rocks jammed in between the point of the switch where it went into the main track?" A. "Not that I could see; you see the track was torn up. The engine was this side (north) of the switch. The engine and tender had passed the switch board, I think. Two or three cars were pushed off to the east and one had careened to the left. The wreck was all at the switch. The ground was torn up there so I do not think you could recognize anything. When we got there, there were two men there. I did not know their names, but they were trainmen. I saw the body of the man there. His body was back at the car that careened to the west side. I remained there but a few minutes. We went back to the wreck a second time. When we left there the first time, we left the two railroad men. There was nobody else there at that time."

Cross-examination: "I did not see Sheriff White the first time I was there. I saw him there when I went there the second time. I saw Mr. Toalson there the second time. Mr. Best, Mr. Toalson, and I went there together the second time. The track was badly torn up at the switch and above and below. It was torn up only a little ways above and below, only two or three car lengths." Q. "Is it not a fact, Mr. Warren, that on a former occasion you made a statement at Burnet to Mr. Tarbutton, to the effect that you went to the scene of the wreck and examined the track on this side of the switch, but made no examination of the ground at the switch, and did not know anything about the condition of the switch, whether or not there were any rocks there?" A. "I didn't see any." Q. "Didn't you make the statement that you didn't examine and did not see any?" A. "No; we were not there for the purpose of examining. I didn't see anything of the kind." Q. "Was not this question asked you: '6. Had any person save the employes of

the defendant reached the wreck before you got there? If so, who was it, and where does such person reside?' And didn't you make this answer: 'No, I don't think there was anyone there when I and Best got there the first time, except the train crew. We were not there more than five minutes the first time. There were a number of people there when we went there the second time.' Now I want to ask you if this question was not asked you on that occasion: 'Please state the exact condition in which you found the track at the switch when you first arrived on the scene, and the condition of the switch. State whether or not the switch was broken and whether or not the track had been torn up, or was it left in its original condition at the point of the switch. Be explicit.' And if you did not answer: 'I could not say that the track was torn up and the ties shoved up together. I never examined the condition of the switch. I never noticed the switch the first time I was there. The track was torn up.' Didn't you make that answer?" A. "Yes, sir." Q. "Is not that true?" A. "Yes, sir." Q. "Were you not asked this question: 'Please state whether or not you saw any rocks or other things placed between the switch track and the main track, or about the bottom of the switch or anything placed there to throw the switch out of line. If you did, describe what you saw and all about it.' And did you not answer: 'No, I didn't notice any rocks, because I didn't make a close examination. I was not there to make an inspection of the switch.' Is not that what you said?" A. "Yes, sir."

Redirect examination: "Mr Tarbutton came to find out what I knew about the wreck. He wrote out this statement. I did not know whether he was an officer taking my deposition or not, and did not ask him. He propounded these interrogatories to me, and I answered them. I can't say for certain whether he told me he was in the employ of the railroad company or not. It has been several months ago since he came to see me. I was in the market at Burnet busy at work when he came to me. I have not talked with any attorney for the plaintiff in this case until to-day, that I remember of. I have received letters from Dr. Johnson. From the examination I made at the time, I will say that if there had been any amount of rock between the point of the switch and the main track, I would have seen it."

Edwin Best, for the plaintiffs: "I live in South Austin. When this derailment of the train occurred, I was with Al Warren, about three or four hundred yards from the scene of the wreck. We heard the noise and went right straight to the wreck. I don't suppose it was over ten minutes from the time we heard the noise until we got to the place where the accident occurred. I don't remember seeing anyone but the fireman when I first got there. The track round about the switch was pretty badly torn up. The whole train had crossed the switch. I think the caboose was about ten or twelve feet from the switch. As well as I remember, the track was thrown over towards the bluff; that is, south, just a little, but the switch was entirely torn up, plumb to the frog. I could not tell what caused the wreck. At that time I did not notice

any rocks in between the point of the switch and the main track. I can't say, though, that I made a close examination of it. We remained there only a few minutes, and went back to my house. I do not remember whom we left there at that time. I believe my little boy was there. I know the fireman was there, but do not remember anybody else. I was gone from there about a quarter or half an hour. I came back with Mr. Warren and Mr. Toalson. From the time I left until the time we got back was between a half and three-quarters of an hour, I reckon. When I got back, Sheriff White and Justice Johnson were not there. If they were there I did not see them. There were several parties there at that time. I did not remain there very long the second time. I do not remember seeing the justice hold court there. When I went back the second time, I looked at the switch track and the switch board again. At that time there were rocks in between the point of the switch and the main track. I had no trouble in finding the rocks; they were pointed out to me by Mr. Toalson. They were limestone rocks. They were wedged in between the switch rail and the main track. They were mashed down, they did not look to be loose." Q. "Put in good?" A. "They looked to be, yes; I never made a close examination; they were pointed out to me, and I just looked at them. I can safely say that there were ten or twelve rocks there; they were plainly visible. I reckon I didn't happen to notice them the first time I was there, though I walked all around there. Some of the rocks were as large as my fist and some larger. They were tolerably close together—looked like they had been crammed in pretty close. As well as I remember, they were a little below the top of the rail."

Cross-examination: "Those rocks indicated where the wheels of the engine had passed over them; they were mashed down. When I was there the first time, I made only a casual examination, and when I came back the second time, I saw them." Q. "Is it not a fact also that you noticed that the connecting rod or switch rod was disconnected?" A. "I remember something of that kind being broken, but I can't say positively. It may have been that, but I can't say positively what it was. It was something at the switch. I do not remember if it was the first time or the second time I was there that I noticed it, but I remember the rod being broken. I remember the rod was broken or disconnected and rocks were placed in between the points of the switch and the main rail. The main wreck and pushing together of the rails was north of the switch. There were no cars against the switch stand. I think that switch track was put in simply to get rock out of the quarry."

Redirect examination: "Opposite the switch stand the track was thrown over next to the hill; right at the point the rod was moved around to the south, just shoved over. That did not extend back and embrace part of the road south of the switch; there was nothing torn up south of the switch, as I remember. I think there were four or five cars thrown entirely off the track; I know that the caboose was not off the track." Q. "Did this derailing there of that number of cars and

the engine and tender tear the track up very badly?" A. "I consider it was torn up pretty badly." Q. "Is it not a fact that you could not tell what caused the derailment from the condition of the track?" A. "No, I could not tell what caused it. I was acquainted with the condition of the track at that place prior to the wreck. The switch track was not level and had loose rails, and most of the time in wet weather it was under water. Between the rails of the main track, from where the wreck occurred on down to the bridge, there were large loose boulders of rock; it didn't seem to be tamped down at all. It was not ballasted; there was no dirt in it. The ties in the switch were set with the lay of the ground; they were not level, and there was no dirt or ballast in between them. I had known that track to be in that condition for about three years. The switch track was moved after the wreck, but how soon afterwards I could not say."

H. L. Moore, for the plaintiffs: "In 1896 I lived in the south extension of the Bouldin addition, in South Austin. I resided something over a quarter of a mile from the scene of the wreck at the quarry. I was at the place where the accident happened on the day following the wreck. The road was fixed up that night, so that trains could pass. The switch was disconnected from the road that night. I was acquainted with the railroad track at that point since about February, 1895. In the switch track the ties were apparently imbedded in the ground; part of each tie was in the ground. The switch went down grade—that is, it leaned towards the bluff. I could not say whether the track was ballasted or not. The switch kinder went down grade sorter; that is it bent sorter towards the bluff; that is it looked like it was leaning towards one side until it got down a little piece. The character of iron on the switch track was old iron. The main track was in good condition. I do not know anything about the switch, as that is something I didn't tamper with."

Charles C. Merrick, for the defendant: "I am the civil engineer and draftsman of the defendant company. I was educated in Ireland, and have pursued my occupation since I was about 16 or 17 years old. I am familiar with the construction of railroads and surveying, and all that sort of thing that pertains to the construction and building of railroads. I have been with the defendant company over ten years. This map shown me was made by me. The switch was not there when I made my survey. This map was made from actual survey on the ground and with reference to the profile of the road. When it existed there, that spur track was simply a track that ran into the quarry for hauling rock. This sketch correctly delineates the location and position of the main track and of the spur track, as it existed at the time of the accident. I have indicated here where the switch stand was. It was pointed out to me by the foreman of the section gang, and the impression was still in the ground where the head block that holds the switch stand was. About here at the whistle board is a curve; the exact point of the curve I am not able to give you, but I think it is right

at the whistle board. In other words, the north point of the curve is about opposite the whistle post. The switch point begins pretty near the switch stand, and these rails that come up here are called the 'leads' to the switch. This, here, is the frog, which takes the direction of the side track or spur; and thus by operation from the switch stand the train is directed. The distance from the switch stand to the south end of the trestle is 119½ feet. The length of the spur track is over 700 feet. I knew nothing of the switch and track before the accident. This is a correct map, as far as it can possibly be made, inasmuch as the indentations of the ties still remained in the ground, showing the location of the track. The distance between the tracks, measuring from center to center, is fifteen feet."

Cross-examination: "I know nothing about where the switch track was, except as shown by the indications. I was never there while the switch was there. I made my survey in March, 1898. I do not know that the place I have indicated as the switch stand was where it stood, except by the indication of that large tie. Its impression was right there. It was a large hole and the indication is very plain. I could not swear that I have the ties in that spur track represented within an inch or two of their exact location, but their representation on my map is practically correct. It is about as well as I could make it considering my information about it. I can be wrong only a very little. I am right, provided this is where the switch began, and provided they did not move the head block. No one told me to leave the curve off my map. I left it off because it would take up more paper and room. It is not a fact that I was told to make a map that did not show the curve. I did not talk to Mr. Tarbutton about making this map. He gave me instructions to make the map. He said, 'You go out there with the foreman, and make a survey of that place.' I refer to the foreman who was there at the removal of the wreck. I don't know his name. After I made this map, I gave it to Judge Stedman, the general attorney of the road. Mr. Tarbutton, I believe, did not see the map until to-day. I am a draftsman, and build railroads when they are to be built. I go along and lay out proper places to build the roads. My map shows from the trestle work to the switch stand, 119.5 feet and from there to the whistle board is forty-six feet. I am familiar with the construction of switch stands. The rails are held in position by irons bolted to the flange by lugs by several different ways, according to the patent. That switch performs the office of holding the rails in position. If you spike the rail down, it can not be used under any circumstances. There is a moving rail, the portion that forms the switch that throws from one track to another. There is no spike in them, because if there were, you could not shove the track. If a switch is properly constructed, the switch and its machinery will hold the rail in position."

Redirect examination: "If the switch is not in use and it is desired to prevent people from throwing the switch, it is a good idea to spike

the rail down. It is usual, when a switch is abandoned and the switch is not removed, to spike the switch stand."

R. E. White, for the defendant: "I went to the scene of the accident late in the evening of that day. I know the time of the accident only by what I was told. I was told it was about half-past 3 o'clock. Justice Mat Johnson and I went out there together. We took a hack and went to the bridge office and went from there on a switch engine. I suppose it took us about half an hour to go out there. When we got there, there were a good many persons there. I did not know many of them. They were all railroad men, unknown to me, except Mr. Powell and the engineer of the switch engine. There may have been others whom I knew. It was late in the evening and raining, and I was busy talking with the railroad men and did not notice particularly who was there. After we arrived at the place where the wreck occurred, I first went to where the cars were standing on the track. They were south of the switch. Some of them had run in on the siding. I think the front trucks of the car standing immediately over the siding where the siding left the main track had taken the siding and the other trucks had taken the main rail. There were eight or ten cars south of the switch, standing on the track. It would be guess work with me to state how far the engine passed the switch, as I didn't pay any attention to that. I had gone down some distance on the siding. I could not say now whether the engine was turned over or not, but I rather think it was. The switch had been thrown at the switch stand. The rails of the switch had been thrown out to the main line rails. The lever had been uncoupled from the foot of the switch stand and the switch thrown, pushing the switch rails over to the main line rails. I saw some rocks in between the two rails. The rails could have been held open by the rocks. The whistle post had been wrenched around in the ground a great deal, and it looked like somebody had been trying to get it up. I did not notice any mud on the whistle post. At the whistle post, Mr. Johnson and I looked for tracks. There had been a great deal of tramping around following the rod. The switch target was turned to show that the main track was open and as though the switch was locked. The lock on the switch stand was broken and hanging there. I think there were three rocks between the point of the switch and the main rail. There were two tolerably large rocks a little larger than a man's fist, maybe one larger than two fists. When the switch track was closed, the rocks were between the two rails; when open, it would drop back some three or four inches, probably more than that. Those rocks were down between the two rails about two and one-half or three feet from the end of the switch rail. I guess that left an opening of three or four inches at the end of the switch and main track. I have that switch lock in my office. It has been in my possession since the wreck. I did not bring in the connecting rod."

Cross-examination: "It was late in the evening when I reached the scene of the accident. I could not see what time it was. It was late in

the evening and we stayed until night. We were there an hour or two. I was told that the wreck occurred at half-past 3. If that be the correct time, I could not say whether it was two or three hours afterwards before we reached there or not. It was in the winter time and it would be guess work for me to attempt to state the hour we reached there. The switch target was thrown to indicate that the main track was clear. I have had a little experience in railroading, having worked in the business about six months, when I was about 18 years old. I worked for the Louisville & Nashville. The track immediately near the switch stand was not torn up. It seemed to be shoved a little and spread some, but the tracks further down I did not examine particularly. The cars were piled down there. The body of young Johnson was lying some distance north of the switch stand, on the west side of the main track. There was a car partially turned over and he was under it. My best recollection is that one of those rocks was about the size of two fists, and one about the size of one fist and one was smaller. I noticed only three. They were right between the switch rail and the main line rail, and the flange of the wheel coming down had run over the rocks. I saw where the rocks were crushed and wedged down. If you take that switch and the lock was broken as I found it, and loosen it, any person of ordinary strength could take the lever and throw the track open, so a train would get off the track, unless the rail was spiked down. In this switch there was a hole in the tie, and spike lying in the switch, partially taken out of the tie just this side (north) of where the switch stand stood. I don't know whether it was spiked down or not. I saw only that one spike. When they bent the switch, the rail was pushed over west, and this spike was in front of the rail. The hole was larger than was necessary for the spike to go in. I could not tell you whether the spike could have been lifted out with the fingers or not. There was a long tie where the switch stand was. I think this hole for the spike was in the tie just north of the long tie. My deposition was taken in this case. I see by the deposition that I stated that the hole was in the long tie. I suppose it is correct. I aimed to make it correct, but I don't remember definitely which tie the hole was in. After the wreck Dr. Johnson came to me, and I told him that in my opinion it was clearly a wreckage of the train, and that nobody could have done it, except somebody who was a railroad man or had been one; I only surmised that in regard to the signal board. I formed my opinion because of the uncoupling of the switch and the turning of the signal to show that the main track was clear. I think that the man who uncoupled the switch board and turned the signal knew his business."

Redirect examination: "When the switch is thrown, that shows the red target. In order to show the white signal, they would have to disconnect the rod at the bottom. The flanges had crushed the rocks a little as they went over. The rocks were not ground up. When I stated to Dr. Johnson that in my opinion the man who wrecked that train knew

his business and was a railroad man, I did not imply that it was any of the railroad employes. I had no reference to the crew."

M. M. Johnson for defendant: "I am justice of the peace, and have been for about six years. I remember going out to the scene of the wreck in company with Sheriff White. I think it must have been as late as 3 o'clock or past that time when we got out there. I know it got dark as we got out there. My recollection is that the engine was off the rails, probably straddling some of the rails. I remember looking more particularly at the box cars. I think the tender was off between the tracks. My recollection is that it was not more than twenty or thirty feet from the switch stand. I don't know how many cars were on the track south of the switch, as I did not count them. I think at least two or three cars had passed the switch and were off the track. The switch was thrown open and some rocks were wedged in between the rails and the switch stand or switch board, or whatever you call it. I am not a railroad man and do not know the name, but it was the lever that worked the switch rod that was unhooked and disconnected from the bar that runs across there. I think the switch lock was broken. It looked like somebody had been twisting the whistle post out of the ground. I noticed tracks around the whistle post. I did not notice any spikes where the rocks were. I did not notice as carefully as Mr. White. I stopped where the man was under the car, and was there some time, getting him out, before going to where Mr. White was."

Cross-examination: "The rocks I saw looked like rocks that had been ballasted in there. They were mashed up and looked like the train had run over them and mashed them some. I found the switch stand cut loose from the bar that catches the rail, and the lock broken and put back in its proper place standing upright. There was no car or engine tumbled over on the side to knock it down."

J. G. Smith, for the defendant: "I am a locomotive engineer on freight trains in the defendant's employ, and have been an engineer on that road for about ten years. I was the engineer of the train on the occasion of the wreck at the rock quarry switch. Mr. Boylan was the conductor, Chris. Reek was the fireman, Mr. Dues was the head brakeman, and Fred Johnson was the swing brakeman. The rear brakeman on a freight train stays in the caboose, and the head brakeman on the front end of the train, about four or five cars back from the engine. At the time of the accident Fred Johnson was riding on the fireman's seat box, in the cab of the engine. There was nothing connected with his duty as swing brakeman that called him to the engine, and he had no business on the engine. I think we had about eighteen cars, engine tender, and caboose in that train. We were coming east towards Austin. As we approached that switch, the target indicated the main line. We approached the switch at about twelve or fifteen miles an hour, not over fifteen. I discovered that the switch was open when I saw the points pried open. I was about sixty feet away when I saw the switch was open. I applied the brakes, the air and the emergency. That train

was partially equipped with air and was equipped with hand brakes, and the engine could be reversed. I applied the emergency, called for brakes, and reversed the engine. Johnson hallooed, 'My God, look there at the switch, Smith.' I said, 'Somebody has been fooling with it.' He jumped off. He had a little bit the advantage of me, for he was closer to the side we had to get off on and that gave him the start of me. By the time I reversed my engine and got down off my box he jumped, and I jumped over him and went beyond about ten feet. The engine then ran on I judge 100 feet beyond the switch, running on the ground. It ran between the main track and the spur track. The engine did not upset. The tender did. I think five or six cars were derailed. I do not know how many cars remained on the track, south of the switch stand, but guess about fifteen. Only one car turned over. The track was not torn up very badly. I think the only place where the track was damaged much was in that culvert. It tore up the cross ties a little. It marked them some. The fireman did not jump off and was not hurt. I went back and examined the points of the switch and found that the switch had been disconnected between the points. Those little straps that hold the points. There are four little rods in here. Whoever did this disconnected these rods and pried this thing over the main line rails and the target was run up for the main line. It showed white. I examined the lock of the switch and found it had been beat with something. I made this examination about five minutes after the wreck. The first thing I did was to crawl over to see if anything could be done, for Mr. Johnson. He was within seven feet of me. A box car had turned over on him and crushed him to death, and then I examined the switch. I was hurt in the shoulder. I did not examine the whistle post. I did not go back that far. I found the switch rod disconnected and saw rocks and spikes shoved in between the points of the rails."

Cross-examination: "I saw four or five spikes holding the points away from the main line rail. I did not touch any of them. Those spikes and rocks were driven in between the point of the switch and the main line, spreading them away from the track. The spikes were dropped in between the rails like the rocks. They were not driven into the ties at all. Johnson was the swing brakeman. I could not tell you whether he worked over the entire train or not. I did not get off my engine before it left the track, nor did Mr. Johnson. The fireman was on the deck of the engine between the tender and the cab, where the fireman shovels coal, at the time Johnson and I jumped from the engine. I have no instructions forbidding brakemen from riding the engines. I do not know whether it was customary for brakemen to occasionally ride on engines or not. It is customary and been practiced here for years for brakemen to ride on top of the train coming down both of these Austin hills. There is a bulletin from San Antonio for the brakemen to be out on the train approaching all stations. I do not know whether it was raining at the time of the wreck or not. It rained very hard afterwards.

It rained off and on all that day, and Johnson had been on the engine principally all day."

Redirect examination: "I think the accident occurred about three o'clock. Going at the speed we were traveling, carrying the number of cars we had in the train, by the application of the emergency, reversing the engine and using all of the appliances, I could have stopped the train within about 250 feet. I said we were about 60 feet away when I discovered that the switch was open. It was impossible at that time to stop the train before going into the switch."

Recross-examination: "Just as you approach that switch as I approached it there is a curve. When back here (south) approaching that curve you could not see any object on the track. Because of the curve you could not see the points of the switch further than sixty feet. If the track had been straight, I could not have seen obstructions 250 yards away, but could have seen far enough to have gotten everything clear. I do not know that I could have seen obstructions in time to have stopped the train, but there would have been no damage done. I was hurt in the wreck, and Mrs. Roy came up there and got me. She invited me to her house, and she and Dues walked with me. I do not remember whether they led me or not. I was suffering a great deal of pain, but was able to walk without assistance, as I was not injured in the limbs anywhere. I was there about the engine somewhere, when they came after me. A car had fallen on Johnson and that was the cause of his death. I was within seven or eight feet of him, and crawled up to him to see what I could do for him. After leaving him I went to the switch. After I got through at the switch I walked on down to the engine. No one went down to Mrs. Roy's to get her to come for me. She came there and invited me to go to her house. Before Mrs. Roy came to the scene of the wreck, the fireman, the head brakeman, the rear brakeman, the conductor and myself were there, and quite a lot of men came around there in a few minutes. The conductor came up there before I went to Mrs. Roy's. I stayed at Mrs. Roy's about three-quarters of an hour or an hour, until the switch engine came out, and I came to town with Mr. Powell. I made a careful examination of things around the wreck. When a man gets hurt he wants to know the cause of it."

John Boylan, for defendant: "I am a freight conductor on defendant's railroad. I was conductor of the freight train which was wrecked at the rock quarry switch. I think we had about fifteen cars in the train. I was downstairs in the caboose just before the wreck. I think we approached the switch at about the rate of twelve miles an hour. J. G. Smith was the engineer, Chris. Reek was the fireman, and H. B. Dues, J. F. Johnson, and Mr. Bowles were the brakemen. Mr. Johnson was the swing brakeman. His position was in the middle of the train. I do not know that any of his duties called him to the engine. There was a call for brakes as we approached the switch, and I ran up in the cupola of the caboose, reaching there just as the wreck started. I could not see the engine when it left the track, as the box cars were

twisted around in the way. After the wreck, I got out of the caboose and looked around, and found the switch rod disconnected and rocks put in between the two rails to keep the switch open. The target showed white, which meant 'track clear' for the main line. To the best of my remembrance the switch lock was broken, and I remember that the switch rod was disconnected. I did not notice how many rocks were between the rails. I think about nine or ten cars remained on the track south of the switch. There were three cars turned entirely over. After leaving the track the engine went about sixty feet, stopping between the tracks. I saw the marks of the engine wheels on the ties. The wrecking began about ten feet north of the switch. It was some time after the wreck before I examined it. I did not examine the track immediately. I did not know what caused the wreck right at the time; didn't have time to talk to the engineer, who was hurt. I came to Austin for help, and as soon as I got back we examined the track. I went to Austin and brought back the coroner's jury and the sheriff. I have not heard anything of Bowles for more than a year, and do not know where he is."

Cross-examination: "The engineer was hurt, but not disabled. He was removed to a farm house while I was gone. When I left to go to town, he was at the front end of the engine. He was moving around there and spoke of going to town for help to get the car off of Johnson, and he said, 'while you are there, do something for me.' He was suffering. Smith came to town that evening, but I do not know how he came. I know that that switch track had been there for about ten years. It was removed after the wreck. The wreck occurred right at the point of the switch. They had been using the switch track. They had been pushing cars in there; piledriver in there; they had been hauling rock out of there. I think they fixed the main track up after the wreck and never connected the switch again. During the ten years I knew that switch, I used it two or three times. I do not know whether I used the switch within a year before the accident or not. The switch track was not in such condition that a train could not be run over it. We have used the switch, but did not run over it at any rate of speed, as it was only a side track. There was a curve right at the switch. An engineer could see the target for some distance, but I do not think he could see the switch over fifty yards, on account of the curve. There is a heavy grade coming this way at that point. It requires two engines to take a train of freights south-bound over that grade. There is no other point on the road where two engines are required for this. I believe the grade commences at about Kouns and comes on gradually until you strike the bridge. I believe this is the heaviest grade on the road of defendant. It had been raining on the day of the accident. At Manchaca I gave Johnson a sack to deliver to a party there, and in getting back on the train he boarded the engine. He had no service to perform on that end of the train from there to Austin. I do not know of any rule forbidding brakemen from riding on engines."

H. B. Dues, for the defendant: "I was head brakeman on freight train No. 66, which was wrecked at the rock quarry switch on December 30, 1896. Mr. Boylan was the conductor, Jack Smith was the engineer, Chris. Reek was the fireman, and Fred Johnson, Mr. Bowles and I were the brakemen. Mr. Johnson was the middle brakeman. I could not tell you whether his duties called him to the engine or not. I have not heard anything of Bowles for a long time. I think we had between fifteen and eighteen cars, engine, tender, and caboose in that train. The wreck occurred somewhere near 3 o'clock in the evening. At the time of the wreck I was on the fourth car from the engine. Fred Johnson was on the engine. If any signal for brakes or any other signal was given, I did not hear it. The car I was on did not upset. It stood straight, but went crosswise the track. The engine left the track right at the point of the switch and stopped about a car length north of the little bridge. The tender stopped just north of the trestle. The engine was straight up and the tender was turned over on its side. I think six or seven cars came north of the switch. Three cars were upset. All the cars south of the switch remained on the track. When we went back to the switch we found it split. There were rocks in the switch and also in the frog. The bottom rod was taken off the switch and the lock had been battered, but was not broken. The switch target showed white, meaning that the main line was clear. The track was torn up at the bridge. The tearing up was north of the switch."

Cross-examination: "I made a careful examination of the track, the switch stand and the bottom of the switch stand. I did not make a careful examination of the rocks. As I said before, I think the lock was not broken, but it was battered. All the cars north of the switch were derailed, some going on one side of the track and some on the other. From the culvert back to the switch some of the rails were torn up, and some were not. The engineer was hurt, but not very seriously. I took him to some lady's house. The lady came up there, and Smith and I went to her house. I assisted him in walking over there. I do not remember whether the lady took him by one arm and I on the other side and led him or not. I took him down there, but there was no ne--cessity for her to help. He leaned on my shoulder and walked down there. He put his arm around me like that, and partly carried him. I found him sitting down on a tie near the side of his engine at the time I started with him down there. He had been there from the time of the wreck, until I carried him to Mrs. Roy's. I had not seen him anywhere else about the train up to that time. I had not seen him up at the other places. I was there about the time he was. We went to no other place together. When I went with Smith and the lady to her house, I left the fireman there. Smith remained at Mrs. Roy's until after the conductor had come to town and Mr. Powell had come out with the switch engine, and he was carried from Mrs. Roy's and put on the engine and brought to town. I do not remember now whether there was anybody else there

or not. Mr. Boylan had come to town. I made my examination after taking Smith to the lady's house. Mr. Boylan got off the caboose immediately after the wreck, and after ascertaining the condition of the train, he came to town. I do not think he made an examination of the switch before he started to town. I examined it before he did. I saw the row of rocks in the switch, but did not notice any spikes."

Redirect examination: "I do not know as a fact that Smith did not make an inspection of the condition of affairs before he was taken to Mrs. Roy's house, as I was pretty well rattled and stove up, and do not remember."

W. W. Nicholson, for the defendant: "I am section foreman on defendant's road from Austin to south of Kouns, and on December 30, 1896, my employment was the same. At that time I had been foreman on that section two or three years. It is my duty to keep the track in good repair and keep the switches and switch stands in good repair, and also to inspect them. I was at the switch where the accident occurred one or two days before the wreck. That siding was used for getting rock out of the quarry—loading cars. I am familiar with the operation of switches, and know their mechanism, and it is my duty to inspect them. That switch was in good condition the last time I was there, one or two days before the wreck. When that spur track was not used for the purpose of getting out rock, I kept it spiked down all the time. We used three spikes, one in the head block, one in the next tie north of the head block, and one in the tie immediately north of that one. When we had occasion to use the switch to get out rock, we had to take a claw bar and pull the spikes out, so that we could throw the switch. The last time I was there, I put in the third spike. I put it in either the second or third tie north of the head block. I do not know what time the wreck happened, but it was after dark before I got there. I made an examination of the track at that point the next day. On the day after the wreck, it looked like the spikes had been driven out and driven down and pressed back with something. All three of the spikes had been pressed back and knocked down. The switch stand was torn down that night in getting the cars out of the way."

Cross-examination: "I was there during the morning of the day following the wreck. Two or three of the spikes seemed to be torn loose and mashed into the wood. As well as I remember, they were all in the holes, but mashed over. What I have testified to in reference to the spikes is what I saw the night of the accident and the next morning, too. When I got there that night the lock of the switch had been taken away. I worked there all that night, helping clear up the track. From the switch on down to the culvert and beyond the culvert where the engine was, some of the rails were torn up and scattered around there. I think some of the irons on the bridge were broken. That was done by the cars. Not all of the track was ripped up generally. Of course it was in different places. There was no trouble with the track south of the switch. The spikes were driven there to keep any accident from

happening,—to make it safe. The spikes were not necessary for the purpose of holding those rails in position. Using switches only once in a while, we have to watch them; and to prevent anybody from tinkering with the switch, we drive spikes in the ties. I was ordered by the roadmaster to drive those spikes in that switch. One of the spikes I put in a day or two before the accident, and the other two had been there for some time. We used the switch occasionally. When we had occasion to go into the quarry we took a man with a claw bar to pull the spikes out. The spikes had been pulled out many and many a time. If so, we put them back in new holes. There was no spike there which you could pull out with your fingers. I have known more than a dozen cars of rock to be hauled out of that switch within four years. Whenever a car load of rock was needed, we would go in and get it. It was a good switch. I have examined and worked with it, and have unlocked and thrown the switch a good many times. Sometimes I would unlock and throw it to see if everything was all right. I had not had orders to remove that switch before the wreck. The switch was removed after the wreck and there has been no switch there since. There is still some rock in the quarry, but it would not pay to rebuild the switch. That switch had rock and ballast in it. It had been surfaced with dirt, rock and gravel. The rock was broken up and put in in small pieces. Some of the rocks were as big as your fist. They were filled clear up to the ties. I looked at the connections of the switch rods the night of the accident; they were torn up. The track was not torn up right at the point of the switch. The tearing up commenced several feet ahead; the track was not torn up until you got past the frog. I have the key to this switch lock. The key will not unlock the lock. I do not know whether the lock that was on the switch was battered or not. I did not see the lock, as it had been taken away. This lock appears to be battered and torn up. It is bent and something is wrong inside of it. Train men carry keys to fit locks. We cleared up the track that night and removed the switch track, and the first train passed over it about daylight the next morning. There was a large force of men at work there from about an hour or two after the wreck until the next morning. The switch rail was spiked down with three spikes. Little rocks could not push it out of place. A man would have to get the spikes out of the way before he could get the rocks in there. It would not have required a man with a claw bar to take the spikes out. He could press them out. He could not take them out with his fingers. He would have to press them back and hammer them back. If he had anything to press them with, it would not make any noise. I think it was three or four hundred yards from the switch to the nearest house. In a wreck like that, if the cars hit the spikes, they would throw the spikes out."

Chris. Reek, for the defendant: "I recollect the accident out at the rock quarry in which Fred Johnson was killed. I was the fireman on the engine on the occasion of that accident. Jack Smith was the engineer, John Boylan was the conductor, Harry Dues was the head brake-

man, Fred Johnson was the middle brakeman, and I do not know the name of the rear brakeman. At the time of the accident I was sitting on the seat box in the cab of the engine. After the wreck I made an examination of the switch stand and appurtenances. I wanted first to see if anybody was hurt. I saw Mr. Johnson pinned under a car, and Smith was crawling out from under a car. My next thought was to stop the engine from burning. When an engine gets out of water she is liable to burn or scorch. I next went to look for the cause of the accident, and found a row of rocks driven in the points of the switch. I did not count the number of rocks. The switch target showed white, which meant that the track was turned for the main line. If the target had shown red, it would have indicated that we were going in on the side track. A man could see the white target there for two or three hundred yards. At that time Smith was up and around looking at the engine and investigating around there. Smith went all around the forward part of the train. He did not go back among the cars or anything like that. My best recollection is that the engine, tender, and cars began to leave the track right on the other side of the switch. The minute the engine left the track, the cars began to leave it. The engine began to leave as soon as it began to run in on the switch. Some of the cars fell down in between the rails."

Cross-examination: "At the time of the accident, I was sitting up by Mr. Johnson on the fireman's seat of the engine. I am certain of that. Smith was there and saw me. I swear that I was not down on the floor, putting coal on the fire. When Smith and Johnson saw what the trouble was, they jumped off on my side of the cab. I saw Smith crawling out from under a car. I don't know whether Smith jumped clear over Johnson or not. When I saw Smith, he was crawling out from under a car about six feet from Curly Johnson, as we called him. It was some time after I left the engine before I saw Mr. Boylan, the time it would take him to come from the hind end of the train. Smith got up and asked me to hand him his clothes out of the seat box, and I handed them to him and he sat down. I don't know how long Smith sat there. He was hurt. I saw several strangers come there in about five or ten minutes after the accident. That was my second trip and the third day as a fireman on that road. I was acquainted with Harry Dues, because I had worked in the roundhouse, previous to going out on the road. The rocks I saw in the point of the switch were as large as my fist; some larger and some smaller. I did not count how many were there. I judge they were common limestone rocks. I did not go to look at the rocks at the time Smith did, because I had to look after the engine and keep it from burning. I must have been about the engine ten or fifteen minutes. It was that long after the accident before I saw the rocks. I would not consider that the track was torn up very badly. I think the tearing up began south of the switch stand. If the track was not torn up it was thrown out of line. I guess the track was torn up for twenty feet south of the switch stand. There is a

possibility that it was longer than ten or fifteen minutes after the wreck, before I got back to where the rocks were. I had no watch, and there was no clock on the engine. I know I jumped off the engine and then got back and got Smith's clothes for him. I got his clothes for him, because he asked me to do so. I am not positive about his being taken down to Mr. Roy's house, but Harry Dues went with him to some place. I don't know whether Dues threw his arm around Smith or not. I know that Dues went with him. I did not see Smith any more. I reckon he came on to town. I got my clothes and took them to the caboose, fixed the engine, and put the fire out. I don't remember of doing anything else before going to where I saw the rocks. I hardly saw the switch before we reached it. When Johnson and Smith saw the switch was turned, they hallooed. I suppose we were about three car lengths from the point of the switch at that time. I did not see the point of the switch, because Mr. Johnson was in front of me and he was a good sized man. Everything was done so quickly, I did not see the rocks until after I got off the engine. A split switch is on the engineer's side, and his was the side where the rocks were driven in. My cab window was partly closed, and it was a damp, drizzly day, and I could not see on account of the steam getting on the window."

Redirect examination: "I know the points of the compass. Towards Austin from the scene of the wreck is north. I stated the engine left the track at the point of the switch. The engine left the track this side of the switch. The break-up of the track commenced where the engine went off on the north side. The track was thrown out of line, as I told the plaintiffs' counsel, on the other side of the switch towards San Antonio. Reversing the engine and applying the air caused a sudden jar. I am not now in the employment of the defendant company."

P. W. Powell, for the defendant: "I live in Austin, and am yardmaster of the defendant company's railroad at this place. I held the same position on the 30th of December, 1896, and have been in the service of the company about nineteen years. I know what this suit is about, and know the switch and switch stand complained of in this suit. I am familiar with switches and their construction and operation. This switch and road at the place of the wreck were constructed and maintained by defendant, and were a part of its line of road. I was over the switch on the morning of the day of the accident, between 10 and 11 o'clock. We helped a south-bound train over the hill at that place. I had a seat on the end of the tender and observed the switch as we passed over it from this seat on the rear of the rear engine pushing the train up this grade, there being to the train an engine in front pulling of it. The switch was in good condition at that time. Machinery and appliances were all right. Between the time I passed over the switch that morning and the time of the wreck, two passenger trains passed over it, one about noon and the other about 1 o'clock. The wreck in which Johnson was killed occurred about 4:30 in the

afternoon, to the best of my recollection, December 30, 1896. I went out to the scene of the wreck, arriving there about forty minutes, or perhaps a little longer after the accident. I went as soon as I received a telephone message and could get over there. I carried Dr. Granberry, Sheriff White, and Justice Johnson over there on a switch engine. From the time we got the crowd together, it took us ten or fifteen minutes to get to the scene of the wreck. From the points of the switch this way (north) the greatest damage was done. The switch rod—the main rod of the switch that connects the stem—was disconnected. This sketch handed me is a correct representation of a switch stand, when it is in perfect working order. The connecting rod is this rod that runs from the stand to the rail. That rod was disconnected from the stand. The target showed white from the main line. In between the points of the switch there were some spikes and rock. The spikes were laid in lengthwise. There were three or four or five rocks. Some were nearly as large as a man's fist. They were jammed in there. You could see where they were broken by the jar of the train. I think there were three spikes there. The spikes were lying in there between the point and the main rail. The rails were out of line. That break-up commenced right at the point of the switch. After the engine had passed over the point of the switch it left the rail and dropped down and fell between the switch track and the main line. The cars followed and tumbled on one side and the other of the track. The engine and tender must have gone 100 feet or more north of the switch stand. I do not remember of seeing any car on the track north of the switch stand. There might have been one car. I think that all the cars north of the stand were off the track. None of the cars struck the switch stand. The little trestle was damaged by the engine and tender in passing over it. The engine was not turned over. The tender was not turned over, but it was sideways and toppled a little. There were three cars entirely turned over. The purpose of that switch track was to take rock out of the quarry. When the switch was not in use, it was kept locked and spiked down all the time. I am familiar with the duties of an engineer, and know how to manage an engine. The switch target is to show the engineer the way the switch is set. When the target shows white, it indicates that the track is safe for the main line. In approaching a switch the engineer looks at the switch target in determining whether or not the track is safe. It might be a part of his duty to look down on the ground to see if the switch points are all right, but he is controlled and goes by the target. In one of these split switches, it would be difficult for an engineer to see the split any distance."

Cross-examination: "I have operated an engine only where it is convenient for me to move one around in the yard. I have never run an engine as a vocation or business. I have fired on the road and handled the engine for the engineer. That is the way engineers learn the business. I could not tell you how long I have operated an engine

in the yard at any one time. I have testified in reference to switch targets, although I am not an engineer, because it is not necessary for me to be an engineer to know what I testified to. All railroad employes in the train service are governed by the same rules and time cards. I could not tell you how many switch targets there are in the Austin yards, without stopping and counting them. All the targets in the yard show red and white. Probably I have run an engine a couple of hours at one time. To the best of my recollection, this wreck occurred about 4:30 p. m., and I got out there in about forty minutes, just as soon as I could get out there. The wreck occurred somewhere between 3 and 4:30 to the best of my knowledge. I was at the telephone when I was first told of the wreck. John Boylan, the conductor of the train, told me over the telephone. He was at Butler's brickyard and telephoned to me. He had to go from the scene of the wreck to Mike Butler's brickyard to telephone me. He ought to have walked that distance in about fifteen minutes. The distance is about a mile, it can't be much over a mile. The engine was there in the yard and ready when I got the message. I telephoned to Mr. White, Justice Johnson, and Dr. Granberry. They came down immediately to the office. I don't remember who came first. I did not run the engine on that trip, because we had a man employed for the purpose. The engine carried Mr. Scott, the roadmaster, and a gang of section hands out to the wreck, to work on it, while we were getting Dr. Granberry and the others. The men were there in the yard, and all they had to do was to get on the engine. I informed them of the wreck. Mr. Scott was in the yard up about the depot. I sent for him. That took but a very little while; it would not take four minutes to do that. My office was at the bridge. Scott was up in the yards somewhere. The engine had to run up there and get him. I could not give you the number of section hands that went to the scene of the wreck before Sheriff White and the others went over. There was a gang of about six or seven men, of which gang Mr. Clark was foreman. The last I heard of Clark, he was out in Utah, or somewhere in that country. When we got there, the six or seven men under Clark were not at work. I did not see them at work, and don't think they had been at work at all. The first thing for them to do was to get the man out from under the car. There was no other gang of workmen besides Clark's men there, when I got there. Another gang came afterwards and went to work on the wreck, making two gangs of men at work there. Johnson's body was under the first car next to the engine. After the engine had taken out Scott, Clark, and the section men to the scene of the wreck, it returned to town and took out myself, White, Johnson, and Dr. Granberry. Where this switch was located there is a very steep grade. It takes two engines to push a full train over the grade. It would be according to the grade, whether a heavy grade such as that, requiring two engines to push a train over it, renders the road more dangerous; in the operation of a railroad the grade

increases the danger somewhat; a curve also increases the danger, and a switch will increase the danger to some extent; the three things occurring at one place on a road would likewise increase the danger. That switch was not put there as a temporary affair. We don't put temporary affairs on main lines. That switch and everything connected with it was as good as any other. It was not there for the passage of trains over it. It was used by any engine that was ordered to go in and take out rock. After the wreck, the switch was never repaired. When it was not in use it was spiked down and locked. I think the last time the switch was used was several months before the accident. It is not a fact that the spikes were so loose that you could lift them out with your fingers. A clawbar would be required to take them out."

The verdict and judgment awarded to the plaintiffs $4120 damages, and the defendant has appealed.

Evidence not set out shows that the plaintiffs are the parents of the deceased; and if the defendant is liable for his death, they were entitled to recovery; and the amount of damages allowed is not so excessive as to require the verdict to be set aside.

*Opinion.*—The plaintiffs' petition charged the defendant with negligence in two respects, viz: (1) the construction and maintenance of its roadbed and track, including the siding or spur track, and in the location, construction, and maintenance of the switch and switch stand and appliances and machinery thereto belonging; and (2) in a failure to exercise the proper care, by inspection, for the discovery of the open switch, etc.

Appellant addressed a general demurrer to the petition, and a special exception to so much thereof as charged negligence in locating the switch at a grade and curve in the track. The general demurrer was properly overruled, and the matters complained of in the special exception were controlled by the charge of the court, as will be hereafter pointed out.

It is not deemed necessary to consider in detail in this opinion all of the many objections urged against the charge given by the trial judge. In its general features, it is quite similar to others emanating from the same tribunal and sustained by this and the Supreme Court, as against many of the criticisms contained in appellant's brief.

However, one of the points made against the charge and not covered by former decisions of this court is, that it authorized a recovery by appellees upon a finding that appellant was guilty of negligence in locating the switch upon a grade and curve in the railroad track; the contention being that negligence can not be predicated upon the mere location of a switch, when the testimony shows, as in this case, that with proper care the railroad can be operated as safely with the switch at that point as elsewhere.

The proposition of law asserted by appellant's counsel appears to be

sustained by two recent decisions of our Supreme Court (Railway v. Rogers, 91 Texas, 52; Railway v. Knight, 91 Texas, 660); but we do not think the charge in this case subject to that objection. On the subject under consideration, as a prerequisite to a verdict for the plaintiffs, the charge required a finding that the death of the deceased was caused by the wreck and derailment of the train, and that the latter "was due to the location of said switch and switch stand at said point and the construction of the road and roadbed at said point, and to the unsafe condition of the same, and that the defendant failed to exercise ordinary care in locating, constructing, and maintaining in a reasonably safe condition for the operation of trains thereon, its roadbed, track, switch, switch stand, and appliances at the point of said derailment." It will be observed that this charge, in order to justify a verdict for the plaintiffs, required a finding that appellant failed to exercise ordinary care in maintaining in a reasonably safe condition its track and switch; and if it did so fail and the wreck was caused thereby, and Johnson's death was caused by the wreck, it was responsible, whether or not it was in default in the other respects stated in the charge. The charge may have placed upon the plaintiffs a greater burden than was imposed by law, but appellant can not complain of that fact. It did not authorize a finding for the plaintiffs upon a mere finding of negligence in locating the switch and switch stand as asserted in the assignment assailing it.

The charge given by the court covered all of the issues which should have been submitted to the jury, and no error was committed in refusing requested instructions.

The court submitted the question of contributory negligence to the jury and the evidence supports the finding against appellant thereon. Railway v. Magrill, 15 Texas Civ. App., 353.

The verdict is not in the usual form, but it finds that the death of George F. Johnson was caused by appellant's negligence, and it awards damages in specified amounts to each plaintiff separately. It is, in legal effect, equivalent to the usual formula, and supports the judgment.

It is strenuously insisted that the evidence does not support the finding of negligence against appellant, and that for this reason the verdict and judgment should be set aside.

After long and patient consideration by every member of this court, we have reached a conclusion adverse to this contention, and the reasons for this conclusion will now be stated.

Before considering the testimony in detail, it is proper to state our views on certain questions of law essential to a correct ruling upon the assignment assailing the verdict.

We concur in the proposition that appellant had the right to locate the switch at the point where it was located, and that it was not guilty of negligence in so doing; but being located at a point where there was a grade and curve in the track, the danger involved in the operation of the road was, according to the testimony, increased; and therefore the

law placed upon appellant the duty of exercising greater care for the safety of the railroad track at that point than would have been required had the switch been located at a point free from the grade and curve.

Furthermore, the testimony shows that a switch, in and of itself, no matter where located, is an element of danger, and requires greater care for the safety of the track at that point. So we start with the proposition that appellant rested under the duty not only to exercise proper care to keep an ordinary railroad track in reasonably safe condition, but such additional care as was reasonably necessary to guard against the additional dangers resulting from a switch (an element of danger itself) and its location at a point which increased that danger.

While the burden of proving negligence on the part of appellant rested upon appellees, when it was developed by the testimony that the derailment and wreck which resulted in the death of Johnson was caused by an open switch, and that he himself was not in fault, these facts were sufficient to justify a finding of negligence against appellant, unless it submitted testimony explaining how the switch came to be open, or at least showing that it had exercised proper care to keep the switch and track at that place in safe condition. McCray v. Railway, 89 Texas, 168; Washington v. Railway, 90 Texas, 314.

It is also well enough to here consider and dispose of the doctrine of assumed risk, as applied to this case. The rule is well settled that the servant assumes all the risks ordinarily incident to the performance of the service he undertakes to render, including risks resulting from the negligence of a fellow servant. But this does not include hazards which flow from the master's negligence, unless the servant is apprised of the existence of such additional hazard and continues to expose himself thereto. The fellow servant doctrine is modified by statute, and has no application in this case, either by common law or statute. Rev. Stats., art. 4560g; Railway v. Dunham, 49 Texas 181.

The deceased had no control over or connection with the switch and track. The service in which he was engaged afforded him no opportunity to do more than casually observe them while passing over the road in the discharge of his duties as brakeman; and it would be unreasonable to charge him with notice of the quality of the material of which they were constructed, and the manner in which they were maintained. He may have been chargeable with notice of the fact that the switch was located at a grade and curve; but, as negligence can not be predicated upon the mere fact that it was so located, notice to him of that fact was immaterial. If he knew it was so located, he had the right to assume that appellant would exercise such additional care as was reasonably necessary to afford a safe track for the passage of trains at that point.

So we get back again to the question of negligence on the part of the railroad company; and upon that issue hinge the rights of the parties and the correctness of the verdict.

If the company failed to exercise such care and vigilance in refer-

ence to the switch and track where the wreck occurred as the law imposed upon it for the protection of Johnson, and his death was caused by such failure, then the doctrine of assumed risk has no application and the verdict should stand. On the other hand, if appellant exercised due care in that regard, it was not guilty of negligence, and the verdict should be set aside.

Another rule of law which prevails in this State may properly be adverted to here, because it is believed that appellant's failure to offer evidence admissible under it is entitled to some consideration in determining whether it has acquitted itself of negligence. We refer to the right of a railroad company, when charged with negligence in such matters as are involved in this case, especially in reference to timely inspections, to prove the general custom of other railroads. Railway v. Harriett, 80 Texas, 73; Railway v. Reed, 88 Texas, 449; McCray v. Railway, 89 Texas, 168; Railway v. Nelson, 20 Texas Civ. App., 536.

We desire also to submit some observations on the law of negligence applicable to this case. Generally a distinction is made between the degree of care owing by a railroad company to its passengers and to its employes. As to the former, they are required to exercise such a high degree of foresight as to possible dangers, and such a high degree of prudence in guarding against them, as would be used by very cautious, prudent, and competent persons under similar circumstances (Railway v. Welch, 86 Texas, 203) ; while as to the latter, it is generally held that they are only required to exercise such care and foresight for their safety as persons of ordinary prudence would exercise under like circumstances. · This latter rule is founded upon what is termed the doctrine of ordinary care, a failure to use which is denominated negligence, and this is the theory upon which this case was tried in the court below.

Though the writer will attempt to show, before closing this opinion, that the distinction referred to ought not to apply to this class of cases, still, if it be conceded that it does and that appellant owed the deceased no higher duty than that of ordinary care, it should be borne in mind that that expression, as used in defining negligence, has a relative meaning, and in some cases its import is quite different from that ascribed to it in common use. A text writer says: "What is the precise legal intent of the term 'ordinary care,' must, in the nature of things, depend upon the circumstances of each individual case. It is a relative and not an absolute term. Chancellor Walworth, in the case of Mayor, etc., of New York v. Bailey, says: 'The degree of care and foresight, which it is necessary to use' (in any given case) 'must always be in proportion to the nature and magnitude of the injury that will be likely to result from the occurrence which is to be anticipated and guarded against. And it should be that care and prudence which a discreet and cautious individual would, or ought to, use if the whole risk and loss were to be his own exclusively.' " Beach on Cont. Neg., sec. 21.

In Cayzer v. Taylor, 10 Gray, 280, it is said: "What is ordinary

care can not be determined abstractly. It has relation to and must be measured by the work or thing done and the instrumentalities used, and their capacity for evil as well as good. What would be ordinary care in one case may be gross negligence in another. We look to the work, its difficulties, dangers, and responsibilities, and then say, what would and should a reasonable and prudent man do in such an exigency? The word 'ordinary' has a popular sense, which would greatly relax the rigor of the rule. The law means by 'ordinary care' the care reasonable and prudent men use under like circumstances." See also Hough v. Railway, 100 U. S., 218.

With these preliminary observations, let us examine the testimony relied on by appellant to break down the prima facie case of negligence made against it.

There was testimony tending to show that both tracks were in defective condition north of the switch stand. Several witnesses so testified as to the spur or switch track; and Best, one of the plaintiff's witnesses, said: "Between the rails of the main track, from where the wreck occurred on down to the bridge, there were large, loose boulders of rock. It did not seem to be tamped down at all. It was not ballasted; there was no dirt in it." It is true that other witnesses, including some called by the plaintiffs, testified that the main track was in good condition; but Best's testimony was before the jury, and they had the right, if they saw proper, to give it credence. But it is claimed by appellant that the condition of the tracks north of the switch was immaterial, the contention being that the sole cause of the wreck was an open switch, and that the condition of the tracks had nothing to do with it.

It may be true that the open switch caused the derailment of the engine and cars, but if there had been nothing but derailment, it is not probable that Johnson would have been killed. His companion Smith, who jumped from the engine as he did, was not seriously injured, and he testified that the car which turned over fell on Johnson and crushed him to death. We think it is fair to conclude that if the car had not turned over Johnson probably would not have been killed.

Now, if the main track was in the condition described by Best, may not such defective condition have facilitated the overthrow of the car? While other witnesses say there were more, Smith, the engineer, said that only one car turned over. May not the wheel of that car been raised by one of the boulders spoken of by Best, so as to cause the car to topple over on its side instead of remaining upright, after derailment, as Smith in effect says that others did? It is no answer to this question to say that the testimony does not show that a boulder or any other defect in the track north of the switch had anything to do with overturning the car. The burden was not upon appellees to show that the defects referred to had such effect, but upon appellant to show that they did not. Furthermore, the engineer and other witnesses spoke of the train running into an open switch; and a layman would perhaps understand this to mean that the switch rails were so adjusted to the main rails as to divert the engine

and cars from the main track into and upon the side track. And there is other testimony, especially that of Sheriff White, tending to show that this was the condition of the switch when the wreck occurred.

The side track and the switch stand were on the east side of the main track; and, as we understand the matter, if the switch was open in the sense referred to, the switch rail and the main rail on the west side were together, and those on the east side were separated or open.

Now if the switch was in this condition, and there is testimony tending to show that it was, it is not clear that the defective condition of the side track did not cause or contribute to the wreck. There was no proof that the mere fact of a train going at the rate of twelve or fifteen miles an hour running into an open switch and on a side track would be derailed, if the side track was of sufficient length to allow the train to be stopped before the engine reached the other end of the siding.

The evidence indicates that the train in question could have been stopped within the distance covered by the side track; and Reek, the fireman, testified that the engine began to leave the track as soon as it began to run in on the switch; and Sheriff White gave it as his opinion that the engine went down some distance on the siding. Smith says that Johnson and he did not leave the engine until it left the track; and it may be that if the side track had been in good condition there would have been no derailment of engine or car and no injury to the deceased.

Therefore, while it is conceded that the prime cause of the wreck was the open switch, it is not rendered certain that defects in one or both of the tracks were not instrumental in causing the death of Johnson. But, if it be conceded that the condition of the tracks north of the switch in nowise contributed to the wreck and the results flowing therefrom, we are still of the opinion that the verdict should not be set aside.

Counsel for appellant contends that the uncontroverted testimony shows that the switch was tampered with and left open by some evil-disposed person, for whose conduct appellant was not responsible. While there is testimony in the record tending strongly to support this contention, there is some evidence pointing to a different conclusion.

The main circumstances relied upon by appellant are, that the switch was open before the engine reached it, though the switch target showed white, which indicated that the switch was closed and the main track was free; that stones and spikes were found wedged in between the switch point and the main rail, as if placed there to hold the switch open; that the iron rod extending from the switch stand to the switch rail and connecting with each, was broken or disconnected from the switch stand; that the switch lock was broken or battered, and that the whistle post was bent over, and looked as if an effort had been made to pull it up.

Smith says that he examined the switch about five minutes after the wreck, and discovered the rocks referred to. The testimony of two of his companions tends to show that he was mistaken as to the time he made

the examination; and the jury would have been warranted in concluding that it was twenty minutes or more after the wreck.

Warren and Best were near by when the wreck occurred, and went immediately to it, and they both say that they did not observe the stones referred to at that time, but did see them when they came back the second time. They state, however, that they were there only a few minutes the first time, and, though they saw both, made no particular examination of the switch and switch stand. Warren, however, stated that from the examination he made, if there had been any amount of rock between the point of the switch and the main track, he would have seen them.

It is claimed, however, that the testimony shows that the rocks between the switch point and main rail were marked by the car wheels, thereby demonstrating that they were there at the time of the wreck. Several of the witnesses so testified, but the witness Toalson, who saw the rocks referred to, swore there were no signs of the flanges of the wheels passing over them. At the point referred to, he said he saw no rocks driven in the ground, like a heavy object had passed over them, though further on he did. And in another place he said, "I saw some of the rocks crushed." The wreck involved the track itself, the latter, according to the testimony of some of the witnesses, being considerably torn up; and it may be that rocks were thrown up on the track north of the switch and run over by car wheels. At any rate, as we understand Toalson's testimony, it militates against the theory that the stones alleged to have blocked the switch were marked by the passing car wheels.

Of course, if the obstructions referred to were not between the switch rail and the main rail at the time of the wreck, they were thereafter placed there by some person; and as no one was shown to be present except the members of the train crew, until the arrival of Warren and Best, counsel for appellees contend that the circumstances warrant the conclusion that some member of the train crew placed them there.

Counsel for appellant insists, that as it was apparent that the train crew were in nowise to blame for the wreck, that no motive existed for them to manufacture testimony. Counsel for appellees, replying to this argument, say that the train employes had at least the motive to benefit their employer prompting them to so place the obstructions referred to, when it was quite obvious that they could not result in personal injury to anyone; and that it is more plausible to attribute such conduct to some member of the train crew on the motives referred to, than to uphold appellant's contention that some unknown person, not shown to have any motive whatever, had purposely tampered with the switch and left it open, knowing that it would probably result in wrecking a train, and seriously, if not fatally, injuring one or more persons.

But whatever may be said on the subject of motive, we think the conclusion is fair and reasonable that if the obstructions were not between the switch rail and the main rail before, and at the time of the wreck, they were placed there by a member of the train crew, although his

motive may have been merely to preserve in statu quo the conditions existing when he first saw the switch after the wreck. He may have deemed it important that the switch should be held open, as he found it, until the sheriff and coroner arrived; and thereafter, he may have concluded to say nothing to the officers about so placing the stones. The members of the train crew who testified were not asked if they placed the stones there, but their testimony is inconsistent with their having done so. However, one member of the train crew, Bowles, the rear brakeman, did not testify in the case, and appellant offered no excuse or explanation for not producing his testimony. After Best and Warren first saw the switch and before Smith examined it, Bowles may have placed the spikes and stones where Smith and other witnesses found them. It is also probable that the wreck of the train dislodged spikes, making them available for that purpose; and it is not shown that any were lying around loose before the wreck.

Some of the witnesses testified that the lock was broken, but Toalson and Dues both stated that it was not broken, but appeared to have been battered. Whether the battering appeared to have been recent or otherwise is not shown. Toalson says that the chain which held the lock to the switch stand was broken, but his examination appears to have been after several persons besides the train crew had arrived at the scene of the wreck. The testimony shows that trainmen carry switch keys, and that Sheriff White carried the lock away. White or some other person may have broken the chain, in order to disconnect the lock from the switch stand, before Toalson made his examination; and if the lock was not broken, as stated by Toalson and Dues, Bowles or some other member of the train crew may have unlocked it. It seems that while testifying, the witness Nicholson had a lock in his hand which was broken; but it was not shown to be the lock in question. But the switch rod was disconnected, and it is claimed that this indicates outside interference.

The testimony shows that the switch rod was disconnected at the switch stand. This breakage may have been caused by wear and tear, resulting from long continued use. The testimony shows that the switch had been there about ten years, and the strain caused by the weight of trains passing, perhaps daily, must have had a tendency to weaken its connections; and it may be that they gave way as a train passed the day before or on the day of the accident.

We do not regard Powell's observations, while passing the switch on an engine, as equivalent to a careful inspection. The rod might have been disconnected at the switch stand without his observing it, if the switch was not open; and, though the rod may have been disconnected, the switch rail may have been held in proper position by the spike, which may have been jolted out by a train passing thereafter.

But it is urged that the switch rail was spiked down, so as to keep the switch shut and the main track clear, though the switch rod should give way. The testimony of Morgan tends to show that prior to that time

but one spike was used, and it was pulled out so often that the hole became enlarged, so that the spike was loose. However, this witness did not know that these conditions existed at the time of the wreck, he not having seen the switch for a considerable time before.

Nicholson, the section foreman, who had charge of the road and switch at that point, says that when he examined the switch a day or two before the wreck, he found the switch rail spiked with two spikes, and that he put in another, making a third. But Sheriff White, who was one of appellant's witnesses, testifying in reference to the switch rail being spiked, said that he saw but one spike and but one hole, and he says that the hole was larger than necessary. In other words, White's testimony tends to show that the conditions in reference to the switch rail being spiked, were the same at the time of the wreck as they were at the time spoken of by the witness Morgan; and if such were the conditions, the jar caused by passing trains may have caused the spike to come out and the switch rail to move, so as to open the switch. And as Nicholson was the only witness who says that the switch rail was securely spiked, it is proper to note that he was not disinterested, and the jury, being the judges of the credibility of witnesses, were not required to accept his evidence as true, even had there been no testimony tending to contradict him. Cheatam v. Riddle, 12 Texas, 112; Coats v. Elliott, 23 Texas, 613; Pridgen v. Walker, 40 Texas, 136; Sonnentheil v. Brewing Co., 172 U. S., 401. We say he was an interested witness, because he says he had been ordered by the roadmaster to spike the switch; and if he did it in an improper and negligent manner, he was derelict in his duty to his employer, and liable to lose his position as section foreman; which he held at the time he was testifying, and also at the time of the wreck.

In reference to the switch target showing white, it is sufficient to say that such was its condition when the switch was closed and in its normal position. And it is not made to appear that opening the switch, after the switch rod was disconnected, would have any influence on the switch target. In other words, we infer from the testimony that if the switch had been unlocked and the switch thrown open in the usual manner, without any break in the rod or other appliances, the switch target would have turned and shown red; and as it showed white, the contention is, that after the switch was thrown open the rod was disconnected to enable the person tampering with the switch to change the target from red to white. But if the rod was disconnected first, opening the switch would not affect the target, and it would remain white. So the fact that it showed white does not prove that the switch was tampered with.

In reference to the whistle post, there is some testimony tending to show that it was bent over, and some of the witnesses say, looked as if some one had attempted to pull it up. It is not shown that these indications were fresh or that the post was not bent when Nicholson examined the switch a day or two before the accident. But if the rocks were placed between the rails for the purpose of promoting the theory of outside interference with the switch, the same person who placed them

there could have tampered with the whistle post to the extent shown by the testimony. Hence we are of the opinion that the testimony in reference to the switch being previously tampered with and left open by an outsider, was not such as necessarily to require a finding in appellant's favor on that issue.

But whether the switch was opened by outside interference, or as the result of ordinary wear and tear upon its appliances, appellant contends that it is not liable, because it exercised due care and diligence to ascertain the condition of the switch. We will first consider this aspect of the case upon the theory that there was no outside interference with the switch; and then, conceding the existence of such interference, will consider it upon that theory.

Nicholson, to whom appellant had delegated the duty of examining and keeping in proper condition the railroad track and switch, states that he examined the switch one or two days before the wreck, and found it in good condition. As he himself was indefinite as to the time and was not unfriendly to appellant, the jury had the right to conclude that his examination was not later than two days before the time of the wreck.

As above stated, the switch and presumably all of its appliances, had been in use about ten years. It is a matter of common knowledge that railroad engines and cars are very heavy; that in their movements, especially when going at a rapid rate of speed, they create great pressure, strain, and friction upon the track and superstructures supporting it; and, in view of these facts, it is not unreasonable to suppose that the appliances which connected the switch rod to the switch stand had become greatly weakened.

Smith's evidence indicates that these appliances consisted of four small pieces; and it may be that they gave way one at a time, as trains passed, after Nicholson had inspected the switch two days before the wreck; and the last one may have broken when Powell's engine pushed the freight train over the grade the morning of the accident. If so, the switch rod was then disconnected; but such disconnection would not cause the switch to come open, nor would it be obvious to Powell or any other passerby, as long as the spike or spikes held the switch rail in proper place. But the evidence will support a finding that there was but one spike in the switch rail, and that it was loose; and the passenger train that passed at noon may have jarred it out of the hole or nearly so, and the other passenger train that passed at 1 o'clock may have completed the mischief and thrown the switch open.

We do not claim that the testimony shows that these things actually happened, but we do think that it was possible for them to have so happened; and if they did, a careful inspection of the switch rod in the afternoon of the day before the accident, or in the forenoon of the day of the accident, would have disclosed that its connections were gradually giving way and breaking. And therefore a finding of negligence on

account of the failure to make such inspection would be supported by the testimony.

But, leaving out of the case the theory of the switch rod breaking on account of ordinary wear and tear, and conceding that the switch was interfered with and opened by some outside person, for whose conduct appellant was not responsible, still it is liable, if the testimony fails to show that it exercised proper care and diligence to discover the condition of the switch and warn the freight train of the danger. Has appellant shown that it did exercise such diligence? The verdict has answered this question in the negative, and it must clearly appear that this conclusion is wrong to justify this court in disturbing the verdict. Does it so appear?

The undisputed testimony of the witness Powell shows that the switch was not open when he passed over it on an engine returning from pushing a south-bound train over the grade and past the switch referred to. If the switch had been open at that time, the engine on its return trip would have left the main track and either gone in on the switch or been derailed. So we conclude, whether the switch was opened by the rod connections wearing out and giving way under the pressure of passing trains, or by the interference of an outside person, it was not so opened until after Powell passed it on the engine referred to. He says that was between 10 and 11 o'clock a. m.; and we think it fair to place the time at 10:30. None of the witnesses seem to have known the exact time when the wreck occurred. Some estimated it at 3 o'clock, some 3:30, and Powell, one of appellant's witnesses, at 4:30 p. m. The jury had the right to consider Powell's estimate as correct. This would leave six hours intervening between the time Powell's engine passed the switch and the time of the wreck. It is contended, however, in behalf of appellant, that, as the testimony shows that two passenger trains passed the switch, one at 12 m. and the other at 1 p. m. the same day, it is apparent that the switch was in good condition at 1 o'clock and was tampered with after that time.

The only testimony in the record on that subject was given by Powell in these words: "Between the time I passed over the switch that morning and the time of the wreck, two passenger trains passed over it, one about noon and the other about 1 o'clock." It is not shown which way these trains were going, whether north or south. If they were going north, and the switch had been in the condition it was when the freight train reached it, they would doubtless have fared as it did. But no witness stated that such would have been the result to a train going south; and, so far as we can determine from the testimony, that result would not necessarily have followed.

The switch was what is known as a spring rod split switch, described in a modern text book as an automatic switch. See Tratman on Railway Track and Track Work, p. 98. Though not so stated by any witness, it is a reasonable inference that the spring is intended to break the rigidity of the switch rod, and render the switch rails flexible, so that the lateral

pressure of an engine moving from the opposite direction will shift the position of the switch rails and permit the train to pass the switch with safety, when the switch rails will resume their former position, as stated in the text book referred to, and shown by testimony in Grattis v. Railway, 55 Southwestern Reporter, 115. Of course, if the switch in question was so blocked as to prevent the switch rail on the east side from returning to the main rail, a south-bound train could not pass and the switch remain blocked, without the wheels on one side or the other crossing the rail. But whether or not this would necessarily wreck the train, would depend on the side on which the wheels crossed. On the west side, the wheels were on the main rail, and if they crossed it, there was no other rail to catch them, and derailment would have been inevitable. But on the east side, the wheels were on the inside or switch rail, and if they crossed it, they probably caught the outside rail, which appellant's map and other testimony indicates was only a few inches from the inside rail.

Furthermore, the switch rail on the east side diverged towards the center of the track; and such divergence would of itself tend to cause the wheels to mount and cross that rail in preference to the other, which, according to the map, appears to have been straight. Though not so stated by any witness, it may be true that if the obstructions were all at the end of the switch rail, and none elsewhere, the pressure of a south-going train would have broken that rail; but according to White's evidence, some of the stones were about three feet from the end of the switch rail; and this may have greatly diminished the strain upon it and held it intact.

It is true, if the switch was so effectually blocked as to prevent the flanges of the wheels from passing between the switch rail and the main rail on the west side, the wheels on that side might leave the track; but there was evidence, especially that of the witnesses Powell and White, that will support a finding that the switch was not so firmly and effectually blocked. The jury had the right to accept Powell's statement to the effect that none of the stones were larger than a man's fist; and no witness stated that they were so placed as to create a barrier of greater width than the largest stone; and it was not shown that such a barrier would have effectually closed the switch on the west side, as against the pressure of a south-going engine. And, while it is not so distinctly stated by any witness, it is not improbable that the switch points were open on both sides when the wreck occurred.

On this point, the evidence is not clear; but if such were not the conditions, then it is probable that the defective condition of the side track was a factor in causing the wreck; because it is not probable that the obstructions as described by Powell so obstructed the wheels of the engine as to cause the wreck.

Hence we say that it is not made to appear that a south-going train could not have passed the switch with safety. In fact, in so far as light

can be gleaned from the meager testimony on this subject, the chances in favor of it doing so appear to have been more than equal.

True it is that Toalson, after describing the condition of the switch, said, "If a train approached it in that way, it would be derailed;" and Morgan gave evidence to the same effect. But the matter under investigation was the wreck of a train running north, and they probably had reference to trains going that direction; because Morgan, apparently giving a reason for his opinion that a train so approaching would be derailed, said, "It would throw it off into the side track," which could not result to a train going south. So we reach the conclusion, that as neither of the passenger trains mentioned by Powell were shown to have been going north, it was not made to appear that the switch was tampered with after they passed it; and, for aught that appears in the record, it may have been tampered with nearly six hours before the wreck occurred. The switch target remained white, indicating an open track; and, for aught that appears in the record, the two passenger trains referred to may have been going south, and may have passed the misplaced switch without any knowledge of its condition.

The testimony fails to show any effort by appellant during the six hours intervening between the time Powell's engine passed the switch and the time of the wreck to ascertain the condition of the switch and track at that point. Considering the extra hazard that this switch, located as it was, subjected the employes on each passing train to, is this court warranted in declaring, as matter of law, that appellant had the right, in so far as the safety of employes operating trains was concerned, to thus remain passive and make no effort to ascertain the condition of the switch and track at the place where the wreck occurred? We think not.

According to the testimony coming from both sides, the switch increased the danger at that point, thereby increasing the necessity for repeated and careful examinations and inspection; and yet it was not shown that appellant bestowed any more attention on that point than upon other portions of its road, having no switches upon them. Nor was it shown that it bestowed as much care upon the switch and track in question as is customary among railroads, as it had the right to do, under the rule prevailing in this State, as shown by decisions heretofore cited. It is true, one of the witnesses stated that it was usual to spike down abandoned switches; but he did not state that such was the only precaution usually taken to guard against accidents and disasters at such points.

In Railway v. Daugherty, 6 American and English Railroad Cases, 139 (Pa.), the plaintiff sued for damages for an injury received while a passenger on the train on the defendant's railroad. The facts were as follows:

"At about 6 o'clock on the evening of November 27, 1878, plaintiff took a train on defendant's road at Elmira, going west, and at about 8:30 o'clock, while between Canisteo and Hornellsville, and within half a mile

of Hornellsville, while running at the rate of thirty-five miles per hour, the train left the track. The shock threw plaintiff forward and by the recoil of the car he was thrown back, receiving an injury to his spine which disabled him.

"The evidence showed that the cause of the accident was a misplaced switch. Defendants produced testimony to show that the roadbed was in perfect order; that the company kept two track-walkers at that point, one of whom walked the track by day, the other by night; that they had each examined the particular switch four times each day and four times each night for months preceding the accident; that the night track-walker had carefully examined it, and found it to be in perfect order one hour before the accident; that one passenger train, called the Monitor train, had passed over it in safety after his examination and prior to the accident; that an average of one thousand cars per day had passed over this switch during the two years it had been there, and no accident had occurred before or since, and that the switch had not been used for two days prior to the accident, and had been securely locked at that time.

"It was in evidence that the engineer had discovered the misplacement when within ten rods of the switch by noticing, by means of the headlight of the locomotive, that the target which was attached to the switch, and used as a safety signal during the daytime, was partly turned, so that, instead of showing entirely white, it showed a little red also. He testified that before he could make up his mind that there was anything wrong the train was off the track.

"It was also in evidence that though the Westinghouse air-brake was being rapidly put in use on defendant company's trains at that time, the engine in question had none. It was, however, designated as the next one in order on the company's books to be sent to the shops for the purpose, and, moreover, the engineer testified that had the air brake been attached, he did not know that he could have stopped the train in time to prevent the accident. There were no lights upon the switch, it not being the practice of the company to place lights outside of stations, nor was this the practice of several other first-class roads."

In disposing of the case on appeal, the Supreme Court of Pennsylvania, in discussing the question of negligence, said: "As to the question of the want of proper lights upon the switch, it does seem to us, the officers of the company themselves being the judges, that the omission in this respect was negligence. For if it was necessary to have targets to this switch, and to have them so painted that they could be seen a long distance in the daytime, much more should they, by some contrivance, be made conspicuous at night, when the dangers of the way are increased by the darkness. Therefore, what the court said to the jury on this branch of the case was quite as favorable to the defendant as it ought to have been."

In that case, as in this, the switch appeared to have been tampered with by some person not connected with the road. That case differed from this

in that the switch target was partially turned, showing some red; and the switch had been carefully examined an hour before the accident.

It was not shown that the railway company had any more reason to anticipate outside interference with the switch than had appellant in this case, and yet it was held to be guilty of negligence in not placing a light at the switch, so that the engineer could have discovered the condition of the switch target in time to avoid the danger.

It is true, that case involved the rights of a passenger. But granting that appellant owed Johnson a less degree of care than was due to a passenger, have not the plaintiffs made a much stronger case and shown a much greater lack of care than was shown in the Daugherty case? It seems to us they have.

In Railway v. Worthington, 21 Maryland, 275, which was also an action by a passenger, and in which the accident was caused by a misplaced switch, it was held proper for the court to submit to the jury whether or not there was negligence on the part of the railroad company in failing to keep the switch guarded by a switch tender.

If, for the protection of passengers, railway companies may be held guilty of negligence if they fail to keep a watchman constantly stationed at a switch when injury results from the switch being tampered with, though they may not owe the same degree of care to an employe operating the train that carries the passenger, do they not at least owe him the duty of inspecting the switch once in every six hours; especially when the switch is located at a point which renders it more hazardous than would be the case if located elsewhere? While we do not hold that it would be proper to affirm this proposition as matter of law, it seems to us that when it has been in effect so affirmed as a matter of fact by a jury, their decision of the question ought not to be set aside on appeal.

Though appellant may not have rested under the same obligation to Johnson that it did to passengers traveling over its road, yet as a misplaced switch, located as the switch in this case was, would necessarily involve employes operating north-bound trains in great personal danger, appellant, under the rule of ordinary care, owed to such employes a high degree of care and vigilance in reference to the switch. If it did not owe them the duty of constantly watching the switch, it did owe them the duty of frequent and careful inspection thereof.

In actions for damages by persons crossing railroad tracks and occupying neither the relation of passenger nor employe, the rule is that the railroad company is only required to exercise ordinary care for the protection of such persons. Yet it has been repeatedly held that as the danger to human life is increased by reason of railroads crossing streets and other highways, so is the degree of care imposed upon those operating such roads increased. And the Supreme Court of Tennessee, in Railway v. St. John, 5 Sneed, 527, which was an action to recover the value of a slave run over and killed by a railroad train, said: "The policy of our own decisions has been, so far as consistent with the safety of life and property, to encourage and protect this most grand and use-

ful improvement of the age. But the consequences of carelessness and want of due skill in their management are so frightful and appalling that the most strict and rigid rules of accountability must be applied, where there is any dereliction of duty. Every reasonable precaution must be used to avoid accidents and injury to others, at the peril of strict and ample accountability."

So in suits to recover damages for grass destroyed by fire caused by the running of railroad trains, the rule is that of ordinary care. It has never been held that a railroad company owes to an adjoining land-owner the same degree of care for the preservation of his grass, or other products of the soil, that it does to a passenger for the safety of his person; and yet, in Railway v. Horne, 69 Texas, 646, our Supreme Court approved a charge declaring the law to be that if it was shown that the fire which caused the destruction of the plaintiff's grass was caused by sparks escaping from the defendant's engine, such proof was prima facie evidence of negligence; and, in order to relieve itself from liability, the defendant must prove that the engine was properly equipped with the best approved appliances for preventing the escape of fire, and that the appliances were all in good repair and condition as regards the escape of fire, or that all reasonable care and caution had been taken to keep them in such repair and condition, and that the engine was carefully and skillfully handled, as regards the escape of fire therefrom.

After holding that this charge was correct as to the burden of proof, Chief Justice Willie said: "We can not say that the proof required to rebut the presumption of negligence was too onerous. The charge of the court in this respect seems to be in accord with the great weight of authority."

Now, if it be true that, in order to prevent pecuniary loss to an adjacent landowner by the destruction of his grass, a railroad company, in the exercise of ordinary care, is required to equip its engines with the best approved appliances for preventing the escape of fire, and exercise all reasonable care and caution to keep them in good condition, ought not such company be required to adopt the best available means for the protection of employes running trains, against injuries which might result from open switches, etc.?

The law is supposed to cherish human life as one of the most valuable earthly possessions; and certainly the life of a brakeman on a train, though an employe of the railway company and not a passenger, ought to be esteemed as highly and guarded as zealously as an acre of grass.

Appellant could have had the switch in question carefully examined and tested, at reasonable intervals, three or four times every day, at no very great expense; and if it had done so, it is not improbable that the disaster which cost the life of a human being would have been averted; and a finding that a failure to do so was negligence, under the rule of ordinary care, ought not to be set aside on appeal.

Although the weight of authority appears to be otherwise, the writer

of this opinion, speaking for himself only, is strongly impressed with the view upheld by some authorities, that in cases similar to this there should be no distinction between the degree of care due from a railroad company to its passengers and its employes. The reason generally given for the distinction is that, knowing that the operation of railroad trains, even with proper care and diligence, is accompanied by dangers and risks, the employe, when he accepts the service, is presumed to take the chances of such dangers and demand and receive additional compensation therefor. But when analyzed this doctrine merely means that if the master has exercised due care and is not guilty of negligence, he is not liable to his servant; and the same is true in reference to passengers. The carrier does not insure the safety of the passenger, and if it has exercised due care, it is not liable, though the passenger may be injured by the wreck of a train or otherwise.

As a further reason for the distinction referred to, it is often stated that the employe assumes the risks resulting from the negligence of a fellow servant, and such risks as he knowingly exposes himself to, after being apprised of his employer's negligence.

These are but two exceptions to the general rule holding the master liable to the servant for injuries resulting from the master's negligence; and, as before stated, this case does not come within either of these exceptions.

In a case like this, where the employe is a brakeman on a railroad train, and is injured by a defect in the track of which he had no knowledge in time to avoid the injury, when the doctrine of fellow servant has no application, when the employe himself is without fault, and the matter of liability depends solely upon the question of negligence on the part of the railroad company in not properly maintaining its track, no satisfactory reason has been suggested for holding that the railroad company does not owe the same degree of care to the employe that it does to a passenger. On this subject an able and discriminating writer uses this language:

"In respect of dangers and defects in the company's roadway and bridges, such as are likely to result in injuries to passengers as well as to servants, it is difficult to separate the degree of care which the company owes the traveling public from that which it owes to those of its servants who are employed in running its trains and laboring at its stations. These servants, from the nature of their employment, have no opportunity to inspect the track and inform themselves of its dangers and defects; and if the company owes them any duty at all in this regard, it is not plain why it should be a duty inferior to that which it owes to the traveling public. And some courts hold that it is not." 2 Thomp. on Neg., p. 986.

The cases cited by Mr. Thompson are all Illinois cases, and from one of them the following quotation is deemed appropriate:

"The duty owing by a railroad company to the public, as well as to those in their employment, is that their road and bridges and other

appurtenances shall be constructed of the best material, having in view the business to be done upon it. In their construction they should equal those of the best roads doing an equal amount of business, and the utmost care and vigilance bestowed upon keeping them in a safe condition. The law will not allow them to be out of repair an hour longer than the highest degree of diligence requires. And, further, it is their duty to keep a sufficient force at command, and of capacity sufficient to discover defects and apply the remedy. Neglecting to keep it in the best condition, if injury or loss occurs thereby, the companies will be liable, and they ought to be so liable. From this responsibility they can not be relieved, except by showing that the defect was one which could not be discerned or remedied by any reasonable skill or foresight." Railway v. Conroy, 68 Ill., 569. In that case the injured party was an employe.

The Supreme Court of Alabama has held, in reference to employes engaged in a dangerous service, that railroad companies owe them that degree of care which very careful and prudent men exercise in their own affairs. Railway v. Davis, 91 Ala., 487.

Suppose in this instance there had been a passenger on the train and he had been killed by the wreck under consideration, would the courts be justified, upon any principle founded in reason and justice, to hold the railroad company liable for his death and not for the death of Johnson? In such case, the railroad company would not be the insurer of the safety of either the passenger or the employe, and the question of liability would depend solely upon the degree of care that it owed to each with reference to the maintenance of its railroad track; and it is not believed that any sound reason can be given for making a distinction in the two cases.

The protection of human life is one of the chief objects of human law; and this protection is accorded without distinction as to persons, unless it has been forfeited by misconduct; and any distinction made as to the duty owing by one person to others, for their protection, should rest upon a doctrine that is sustained by reason and justice, and not upon an arbitrary rule founded upon the mere fact that one is a passenger and another an employe.

A brakeman or other employe assisting in operating a railroad train is as much entitled to ride thereon as is a passenger who has paid his fare; his chances of injury are at least equal to those of a passenger; his life is as precious in the eyes of the law as is the life of a passenger; and the dictates of justice and fairness demand that the railroad company should exercise the same degree of foresight and care for the protection of one as the other, against such danger as, in the nature of things, they can not protect themselves.

It is conceded that these views conflict with the current of authority in this and most other jurisdictions, and with views formerly entertained by the writer; but subsequent investigation and consideration have caused

me to change my opinion; and, believing the views expressed to be sound, I have ventured, with due respect, to give them utterance.

We have examined the cases cited by appellant's able and zealous counsel, but find none of them analogous, in all respects, to this case. But two of them involved liability resulting from open switches, and these will be adverted to.

In Keeley v. Railway, 47 Howard Practice, 256, it was clearly shown that the switch had been misplaced by some third person. The switch was carefully examined by the track-walker at 8 o'clock; at 8:34 a train passed with safety, though the opinion does not state in which direction; and it appears that the switch was misplaced between that time and 9:47, a period of one hour and thirteen minutes. The plaintiff was a passenger, and it was held that the railroad company was not liable.

In the case at bar, if it be conceded that the switch was tampered with, and that this occurred after the 1 o'clock passenger train passed, the evidence will support a finding that the wreck occurred three and a half hours after the passenger train passed, but, if the passage of Powell's engine be taken as the last satisfactory test of the condition of the switch before the wreck, as we think it should be, then the time would be about six hours, or about five times as much as the time in the Keeley case.

In the other case (Piper v. Railway, 56 New York, 630), an engineer was killed in a wreck caused by a misplaced switch. A train had passed the switch in safety about half an hour before the wreck. The plaintiff was nonsuited and the principal point urged on appeal was that the question whether a patent switch had been taken out at Piper's request, should have been submitted to the jury. The proof was uncontroverted that the patent switch had been taken out at Piper's request, and the court was not requested to submit that question to the jury. On appeal it was held that no error was shown. It is also stated in the opinion that the case was properly disposed of by the trial court independent of that question.

We have also examined Railway v. Kane, 22 Lawyers' Reports Annotated, 315; Fredericks v. Railway, same volume, 307, and many of the cases therein referred to. The Kane case was reversed because of error in the charge, and because the deceased, who was the engineer in charge of the train which was wrecked by a misplaced switch, was guilty of contributory negligence in running his train at a high rate of speed while approaching the switch, in violation of positive rules of the company of which he had knowledge. But in that case it is stated and repeated, that the only practical way of ascertaining whether or not in any particualar instance a railroad company has exercised the proper degree of care in protecting its switches from interference, is to leave the question to a jury.

Of course we do not understand the court to mean that a jury may arbitrarily decide even a question of negligence contrary to the undisputed evidence, and leave the losing party without remedy. But as the ques-

tion of negligence depends upon the degree of care that should have been exercised in the particular instance, the evidence may be such, in a given case, as that reasonable and fair-minded men may differ as to whether due care was exercised; and in such a case, it is believed that a verdict embodying the unanimous judgment of twelve men should not be set aside by an appellate court.

It may be proper to consider one other subject before closing this opinion. There appears to be some difference among courts and judges as to the care and precaution that should be used by railroad companies to prevent outside interference with their tracks and switches. Some declare that they are not required to anticipate and guard against wrongful and unlawful acts upon the part of trespassers, and may presume that there will be no unlawful interference with their tracks and switches. It is not believed that this proposition is sound.

It is a reasonable presumption, if not a matter of common knowledge, that railroads are owned and managed by men of intelligence and capacity; that they are familiar with past and current history and conditions; that they know evil disposed persons do sometimes tamper with railroad tracks and switches, for the purpose of wrecking trains, and they must conduct their business and operate their trains with reference to these known facts. And it is believed that the degree of vigilance which they are required to exercise to guard against injuries resulting from unlawful interference with tracks and switches must be determined and regulated by the possibility and probability of such interference and the grave consequences likely to result therefrom. They will not be permitted to close their eyes to conditions known to exist, and justify themselves upon the alleged right to presume that no person intends to commit a crime.

Suppose, during a railroad strike in Chicago or some other city a threat by the strikers, made known to the railroad company, to tear up the railroad track near the city is put into execution, and the company makes no effort to prevent such interference or ascertain if it has occurred and warn approaching trains; and three hours thereafter an incoming train, unaware of such interference with the track, is wrecked by reason thereof. Could the company, when sued by either passenger or employe, escape liability upon the doctrine that it had the right to presume that the strikers would not violate the law, and was under no obligation to adopt meausures to prevent unlawful interference with its track, or to ascertain that it had been so interfered with and warn the approaching train? Most assuredly it could not, because the law would charge it with a knowledge of the fact that evil-disposed persons were threatening to tear up its track, although in doing so they might commit a felony. And, in such a case, the exercise of due care would require the railroad company either to protect its track from such unlawful interference, or to warn all approaching trains before or after the interference had occurred.

Of course, the illustration given differs materially from the case at

bar, but it demonstrates the proposition that railroad companies have not the right, under all circumstances, to presume that no one will unlawfully interfere with their tracks. In fact, they have no such right at any time, it being a matter of common knowledge that railroad tracks are sometimes, without warning, tampered with by evil-disposed persons; and the true rule in determining the question of liability is, did the company exercise the proper care and vigilance to guard against injury resulting from such interference? And the degree of care and vigilance must be in proportion to the degree of probability of such interference and the harm likely to result therefrom.

In many instances, where railroads traverse many miles of sparsely inhabited territory seldom frequented by disreputable and lawless characters, in the absence of specific threats, there is less probability of such interference and the degree of vigilance required to guard against it is correspondingly slight.

In the case at bar, the switch in question was located near the capital city of the State, where it is not unreasonable to suppose lawless characters sometimes drift. The record shows that appellant recognized its duty to guard the switch against outside interference, and instructed one of its employes to spike it down. Whether or not there was any special reason for apprehending such interference, the testimony does not inform us; but we believe that the jury were authorized to reach the conclusion that it was not made to appear from the testimony that appellant had exercised that degree of care to protect its track from defects caused by ordinary wear and tear, or by outside interference, that was imposed upon it by law, for the benefit and protection of the deceased, and so believing, the verdict will not be set aside.

We are not to be understood as holding that it was the duty of the railroad company to constantly guard the switch; and we sustain the verdict mainly upon the theory that due care and vigilance was not shown to have been exercised to ascertain that the switch had been tampered with and warn the approaching train of the danger.

Our own Supreme Court has approved a charge stating that a "duty imposed by law upon a railroad corporation is to do everything that can reasonably be done for the safety of its employes;" the court holding that, in the case then under consideration, predicated upon a defective wheel of a hand car, ordinary care would require all that was stated in the charge. Railway v. Wells, 81 Texas, 685. And we think the jury in this case had the right to conclude that appellant had not, in the matters under consideration, exercised all reasonable care for the safety of its employes.

We have carefully considered all the questions presented in appellant's brief, and finding no reversible error, the judgment will be affirmed.

COLLARD, ASSOCIATE JUSTICE.—In this case I wish to say that, the conditions at the point where the wreck occurred on the road being more dangerous to employes of the road than at other points, the switch being

constructed on the outside of a curve in the track, ordinary care, such as a person of ordinary prudence would exercise under like circumstances, would require greater watchfulness at the point than at other points on the road; but still, only ordinary care would be required,—ordinary care commensurate with the dangerous conditions; and I think it is not shown that such care was exercised by defendant at this point,—at least, that the testimony warranted the jury in so finding. Greater care is required in the protection of passengers on railway trains, as shown by decisions in this State.

I concur in the disposition of the case made in the opinion of Justice Key.

FISHER, Chief Justice.—I agree with the court only as to the last ground of negligence discussed in the opinion. I can not say from the facts that the jury were not authorized to draw the conclusion that the railway company had not exercised proper care and diligence in inspecting and guarding the switch. I can not agree with the court in the conclusions reached as to the other grounds of negligence discussed in the opinion.

*Affirmed.*

In this case writ of error was granted by the Supreme Court but the errors assigned were never finally ruled upon by that court; the case was reversed and dismissed in accordance with agreement of counsel.

The memorandum made at the time of granting the writ shows: "We are inclined to think that there was no evidence of negligence in locating the switch, and that the court erred in charging upon that issue."

From appellants' application for writ of error. *S. R. Fisher,* for petitioner.—The Court of Civil Appeals erred in holding that the charge of the trial court was not obnoxious to the objection that it authorized a recovery by appellees upon the finding that appellant was guilty of negligence in locating the switch upon a heavy grade and in close proximity to a sharp curve, because the testimony, without conflict, showed that a switch so located, or located as was this switch, could be operated over with safety, there being no charge or pretense that the wreck in which plaintiffs' decedent lost his life was caused or produced by any negligence in the operation of said train.

If it be conceded that the jury, as a condition precedent to a recovery, were required to find that the defendant had failed to exercise ordinary care in "maintaining in a reasonably safe condition its track and switch," still the fact remains that, under the charge, they were authorized to consider, either by itself or in connection with other elements of alleged failure to exercise such care, the location of the switch, etc., "near the north end of a sharp curve and on a steep grade."

The statement by the Court of Civil Appeals that the appellant, by its assignments of error, assailed the charge, in the particular complained of, on the ground solely that it authorized a finding for plaintiffs

"upon a mere finding of negligence in locating the switch and switch stand," is incorrect. The assignments assailed the charge because it authorized the location of the switch near a sharp curve and on a steep grade to be taken into consideration at all, either by itself or in connection with other alleged acts of negligence, in determining whether there had been negligence in original construction or subsequent maintenance in failing to construct and maintain, in a reasonably safe condition, its roadbed, track, switch, switch stand, etc., at the place of derailment.